1  SCOTT + SCOTT, LLC
   ARTHUR L. SHINGLER III (181719)
2  401 B Street, Suite 307
   San Diego, CA  92101
3  Telephone:  619/233-4565
   619/233-0508 (fax)
4          -and-
   DAVID R. SCOTT
5  108 Norwich Avenue
   Colchester, CT  06415
6  Telephone: 860/537-3818
   860/537-4432 (fax)
7
   Lead Counsel for Plaintiffs
8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

12 ARCHDIOCESE OF MILWAUKEE          )  No. 05-cv-3395-JF
   SUPPORTING FUND, INC., On Behalf of )
13 Plaintiff and All Others Similarly Situated, )  CLASS ACTION
                                      )
14                       Plaintiff,   )  [CORRECTED] COMPLAINT FOR
                                      )  VIOLATIONS OF THE FEDERAL
15         vs.                        )  SECURITIES LAWS
                                      )
16 MERCURY INTERACTIVE               )
   CORPORATION, AMNON LANDAN,        )  DEMAND FOR JURY TRIAL
17 DOUGLAS P. SMITH, ANTHONY         )
   ZINGALE, SUSAN J. SKAER, BRAD     )
18 BOSTON, IGAL KOHAVI, CLYDE        )
   OSTLER, GIORA YARON, YAIR SHAMIR, )
19 DAVID JAMES MURPHY III, YUVAL     )
   SCARLAT and BRYAN LEBLANC,        )
20                                    )
                                      )
21                       Defendants.  )
                                      )
22 ─────────────────────────────────  )

23

24

25

26

27

28

1    Plaintiff, individually and on behalf of all other persons similarly situated, by plaintiff's

2    undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon

3    personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all

4    other matters, based on, inter alia, the investigation conducted by and through plaintiff's attorneys,

5    which included, amongst other things, a review of the defendants' press releases, Securities and

6    Exchange Commission ("SEC") filings by Mercury Interactive Corp. ("Mercury Interactive" or the

7    "Company") and media reports about the Company. Plaintiff believes that substantial evidentiary

8    support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

9                                    **SUMMARY AND OVERVIEW**

10           1.      This is a securities class action on behalf of all persons who purchased or acquired the

11    securities of Mercury Interactive ("Mercury Interactive" or the "Company") between October 22,

12    2003 and July 5, 2005 (the "Class Period").

13           2.      Mercury Interactive claims to be in the business of providing software and services to

14    the business technology optimization (BTO) marketplace. The Company's IT governance offerings

15    are used to prioritize and automate IT business processes from demand through production. The

16    Company's application delivery offerings enable customers to optimize custom-built and

17    prepackaged software applications before they go into production. The Company's application

18    management offerings enable customers to optimize business availability and problem resolution, as

19    well as to proactively manage and automate the repair of production problems.

20           3.      Unbeknownst to investors, defendants' ***internal controls and corporate compliance***

21    ***during the Class Period were flawed and deficient.*** Moreover, defendants concealed extraordinary

22    auditing expenses during the Class Period, in connection with the ***"highly likely" need to restate***

23    ***earnings for multiple quarters and years.***[1] Defendants were aware of their flawed and deficient

24

25

26    _____

27    [1]      Although defendants were asked in November of 2004 by the SEC to look into the matter
      and have spent over $1 million on audits prior to June 30, 2005, they still refuse to admit more than

28    "highly likely" materiality and a "highly likely" need for earnings restatements.  See ¶ 89.

1   controls and compliance practices from the very beginning of the Class Period and their concealment

2   served to inflate the value of the stock during the Class Period.

3           4.     As a result of the stock price inflation maintained during the Class Period, defendants

4   achieved lucrative executive bonus executive compensation and enhanced employment agreements,

5   serving to discourage insider trading. By concealing the Company's deficient and defective internal

6   controls and corporate compliance, defendants were also *able to assure the successful resale of*

7   *notes by selling holders in connection with its $500 million convertible notes offering pursuant to*

8   *the Company's registration statement/prospectus and themselves sell $6.3 million in Company*

9   *stock at inflated prices.*

10          5.     Defendants' scheme served to maintain an inflated price of the stock through the end

11  of the convertible notes offering period, followed by false and misleading disclosures serving to

12  remove inflation from the price of the stock. Finally, on July 5, 2005, defendants finally revealed the

13  shocking news about previously undisclosed accounting irregularities and the Company's ongoing

14  internal investigation and auditing process, a process that had already incurred as much as $1 million

15  in undisclosed expenses. As a result, the price of Mercury Interactive stock tumbled $7.67 or 16.7%

16  from its interim high of $45.88 on May 24, 2005, until the price of the stock bottomed on July 5,

17  2005.  On the news of July 5, 2005, the price of the Company's stock fell $0.25, to $37.96, *on*

18  *unusually heavy volume of 12.2 million shares, nearly six times average volume.*

19                                **JURISDICTION AND VENUE**

20          6.     The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of

21  1934 ("Exchange Act") (15 U.S.C. §§78j(b) and t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5)

22  thereunder.  Jurisdiction is conferred by §27 of the Exchange Act (15 U.S.C. §aa), §22(a) of the

23  Securities Act (15 U.S.C. §77v(a)) and 28 U.S.C. §1331.  Venue is proper in this district pursuant to

24  §27 of the Exchange Act, and 28 U.S.C. §1391(b) because the defendants maintain an office in this

25  District and the wrongful conduct giving rise to the violations of law complained of herein, including

26  the preparation and dissemination to the investing public of false and misleading information, took

27  place in this district.

28

7.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

**PARTIES**

8.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased shares of Mercury Interactive stock at artificially inflated prices during the Class Period as described in the attached certification and was damaged thereby.

9.     Defendant Mercury Interactive provides software and services to the business technology optimization (BTO) marketplace. Its offerings consist of integrated software, services, and practices that enable companies to use a centralized approach to manage software applications and information technology (IT). The Company's IT governance offerings are used to prioritize and automate IT business processes from demand through production. The Company's application delivery offerings enable customers to optimize custom-built and prepackaged software applications before they go into production. The Company's application management offerings enable customers to optimize business availability and problem resolution, as well as to proactively manage and automate the repair of production problems. Mercury Interactive maintains its corporate and administrative offices, where the Company's day-to-day business activities are conducted at 379 North Whisman Road, Mountain View, CA 94043-3969.

10.     Defendant Amnon Landan ("Landan") was at all relevant times hereto Chief Executive Officer ("CEO") and Chairman of the Board of Mercury Interactive. As Chairman and CEO, Landan prepared, reviewed and signed the Registration Statement/prospectus and amendments, in connection with the notes offering.  During the relevant period, defendant Landan received $800,000 in bonus compensation for the year ending December 31, 2004, tied to performance measures that included the inflated price of the Company's stock. On February 11, 2005, the Company entered into a new employment agreement with defendant Landan that, amongst other things, provided handsome benefits in the event of involuntary termination, including (i) a severance payment equal to 75% of his annual base salary and target bonus (in 2005, equal to $1,125,000); (ii) a present value lump sum payment of Landan's long-term service bonus, worth at

1   least $1.8 million; (iii) 36 months of Company-paid health care coverage; (iv) a pro-rated target
2   bonus for the year of termination (worth as much as $750,000 in 2005); (v) 24 months' accelerated
3   vesting of stock options or other equity awards; (vi) 12 months to exercise any options granted after
4   the date of the Agreement or any options that have exercise prices above the fair market value of the
5   Company's stock on the date of the Agreement; and (vii) full vesting of any outstanding award under
6   the long-term incentive plan or for any award for which the performance period has not been
7   completed (worth as much as $1,600,000 in 2005).  These benefits provided defendant Landan
8   strong motivation to encourage the inflated value of the Company's stock, the sale of the Company
9   and not engage in insider stock sales.

10          11.     Defendant Douglas P. Smith ("Smith") was at all relevant times hereto Executive
11   Vice President and Chief Financial Officer ("CFO") of Mercury Interactive. As CFO, Smith
12   prepared, reviewed and signed the Registration Statement/prospectus and amendments, in
13   connection with the notes offering.  During the relevant period, defendant Smith received $350,000
14   in bonus compensation for the year ending December 31, 2004, tied to performance measures that
15   included the inflated price of the Company's stock. In addition to this bonus compensation,
16   defendant Smith received other non-salary compensation for the year ending December 31, 2004 of
17   $101,561. On December 20, 2004, the Company entered into an amended and restated change of
18   control agreements with Smith, providing change of control severance benefits, including (i)
19   severance pay equal to 12-months of the executive's base compensation and annual target bonus as
20   of the date employment ceases; (ii) continued coverage under Mercury Interactive's health, life,
21   dental and other insurance programs for the 12-month severance pay period; and (iii) accelerated
22   vesting of all stock options, shares of restricted stock and other forms of long-term compensation
23   held by the executive at the time of termination. These benefits provided defendant Smith strong
24   motivation to encourage the inflated value of the Company's stock, the sale of the Company and not
25   engage in insider stock sales.

26          12.     Defendant Anthony Zingale ("Zingale") was at all relevant times hereto President,
27   Chief Operating Officer and a director of Mercury Interactive. As a director and later as President,
28   defendant Zingale prepared, reviewed and signed the Registration Statement/prospectus and

1   amendments, in connection with the notes offering.  On December 1, 2004, the Company entered

2   into an employment agreement with Anthony Zingale whereby Mr. Zingale would serve as the

3   Company's president and chief operating officer. Amongst other things, the agreement provided

4   benefits for employment termination by the Company without "cause" or by Zingale for "good

5   reason", including (i) receipt of a severance payment equal to one year (or two years, if he has been

6   employed for more than four years at the time of termination) of base salary and target bonus in

7   effect as of the date of termination; (ii) continued coverage under the Company's health, life, dental

8   and other insurance programs for the one or two-year severance pay period; and (iii) accelerated

9   vesting of Zingale's outstanding options that would have vested, absent the end of employment,

10  during the 12-month period following termination. On December 20, 2004, the Company entered

11  into an amended and restated change of control agreements with Zingale, providing change of

12  control severance benefits, including (i) severance pay equal to 12-months of the executive's base

13  compensation and annual target bonus as of the date employment ceases; (ii) continued coverage

14  under Mercury Interactive's health, life, dental and other insurance programs for the 12-month

15  severance pay period; and (iii) accelerated vesting of all stock options, shares of restricted stock and

16  other forms of long-term compensation held by the executive at the time of termination. These

17  benefits provided defendant Zingale strong motivation to encourage the inflated value of the

18  Company's stock, the sale of the Company and not engage in insider stock sales.

19          13.     Defendant Susan J. Skaer ("Skaer") was at all relevant times hereto a Vice President,

20  General Counsel and Secretary of the Company. Skaer prepared, reviewed and signed the

21  Registration Statement/prospectus in connection with the notes offering. During the Class Period,

22  defendant Skaer sold 18,000 shares of her Mercury Interactive stock, for proceeds of $0.8 million.

23          14.     Defendant David James Murphy III ("Murphy") was at all relevant times hereto a Sr.

24  Vice President of Corporate Development of the Company. During the Class Period, defendant

25  Murphy sold 40,000 shares of his Mercury Interactive stock, for proceeds of $1.7 million.

26          15.     Defendant Yuval Scarlat ("Scarlat") was at all relevant times hereto a Senior Vice

27  President of Products of the Company. During the Class Period, defendant Scarlat sold 70,000 shares

28  of his Mercury Interactive stock, for proceeds of $3.2 million.

16.     Defendant Bryan LeBlanc ("LeBlanc") was at all relevant times hereto a Vice President of Finance of the Company. During the Class Period, defendant LeBlanc sold 7,000 shares of his Mercury Interactive stock, for proceeds of $0.3 million.

## DEFENDANTS' CONTROL OVER MERCURY INTERACTIVE AND ITS COMMUNICATIONS TO THE PUBLIC CONCERNING FINANCIAL RESULTS

17.     Each of the above officers and directors of Mercury Interactive, by virtue of their high-level positions with the Company and committee memberships, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading press releases, statements and information alleged herein, knew or recklessly disregarded that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

18.     In addition to the above-described involvement, each Individual Defendant had knowledge of Mercury Interactive's problems. Each defendant was motivated to conceal such problems.  Defendants Smith and Le Blanc, serving as CFO and VP of Finance, respectively, provided for financial reporting and communications with the market.  Defendant Smith directed communications with the market, including conference calls, as well as internal reports showing Mercury Interactive's forecasted and actual growth.  Defendant Landan, serving as Chairman and CEO also provided for communications with the market, including conference calls, as well as reports on Company operations, financing and press releases issued by the Company.

19.     Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market.  Each Individual Defendant also owed a duty to the Company and its shareholders not to trade on inside information.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

20.     Each defendant is liable for (a) making false statements, *or* (b) failing to disclose adverse facts known to him about Mercury Interactive.  Defendants' fraudulent scheme and course

1   of business that operated as a fraud or deceit on purchasers of Mercury Interactive publicly traded

2   securities was a success, as it (a) deceived the investing public regarding Mercury Interactive's

3   prospects and business; (b) artificially inflated the prices of Mercury Interactive's publicly traded

4   securities; (c) facilitated continued sales of its $500 million Zero Coupon Senior Convertible Notes

5   due 2008; (d) allowed defendants to obtain larger bonuses which were directly tied to the Company's

6   falsified performance; (e) provided defendants with an opportunity to successfully negotiate

7   employment contracts on highly favorable terms; (f) allowed defendants to sell over 135,000 shares

8   of Mercury Interactive stock at inflated prices, for proceeds of approximately $6.1 million and (g)

9   caused plaintiff and other members of the Class to purchase Mercury Interactive's publicly traded

10  securities at inflated prices.

11                                  **OVERVIEW OF THE FRAUD**

12          21.     Defendant Mercury Interactive provides software and services to the business

13  technology optimization (BTO) marketplace. Its offerings consist of integrated software, services,

14  and practices that enable companies to use a centralized approach to manage software applications

15  and information technology (IT). The Company's IT governance offerings are used to prioritize and

16  automate IT business processes from demand through production. The Company's application

17  delivery offerings enable customers to optimize custom-built and prepackaged software applications

18  before they go into production. The Company's application management offerings enable customers

19  to optimize business availability and problem resolution, as well as to proactively manage and

20  automate the repair of production problems.

21          22.     In simplest terms, the Company is in the business of design and sales of software

22  tools targeting overall corporate compliance, offering a variety of process and systems applications,

23  including its "Sarbanes-Oxley IT Assessment Accelerator"[2]:

24          A Complete BTO Solution

25          Mercury Sarbanes-Oxley IT Assessment Accelerator is part of Mercury Quality
            Center™, an integrated suite of applications ***that automate the processes, controls,***
26  _____

27  [2]     See http://www.mercury.com/us/solutions/sox/it-assessment-accelerator/works.html, last

28  accessed on August 19, 2005.

*audits, and assessments required for sustainable compliance.* Quality Center provides automated software testing and quality assurance across a wide range of IT and application environments.

Mercury Sarbanes-Oxley IT Assessment Accelerator and Mercury Quality Center are an integral part of Mercury's overall Business Technology Optimization (BTO) strategy to provide integrated support for SOX compliance across Mercury Optimization Centers™.

23.     In fact, defendants purport to be experts in the area of corporate compliance, going so far as to provide approaches for *analysis of deficiencies and achievement of compliance goals,* as further detailed on the Company's website[3]:



Sustainable compliance with Sarbanes-Oxley means the death of "ad-hoc" IT processes. The Sarbanes-Oxley Section 404 affirmation requirement spans all processes that affect the business cycle of the company and any software applications used to support those processes, directly or indirectly. It also requires that these processes be effectively controlled.

Section 404 includes three control categories:

*Company-Level controls (or Entity Controls), including enterprise policies, corporate governance, and information sharing;*

Application Controls for both financial/ERP systems and specialized applications, covering such areas as segregation of duty, authorization, validity, and accuracy

---

[3]     See http://www.mercury.com/us/solutions/sox/process-control-frameworks/, last accessed on August 19, 2005.

[CORRECTED] COMPLAINT                                                                 -8-

IT General Controls, governing program development, program changes, computer operations, and access to programs and data; and

***Mercury's Sarbanes-Oxley Accelerators address all three control categories, enabling companies to automate and enforce their compliance processes.***

24.     The Class Period begins on October 22, 2003, when defendants provided actual 4Q03 and projected 1Q04 GAAP and non-GAAP financial results prone to error and manipulation, since defendants' internal controls and compliance practices were deficient and defective, to the extent that they would cause unprecedented auditing activities culminating in the disclosure of the "very likely" need to restate financial results over multiple quarters and years. Moreover, defendants introduced confusing business metrics designed to convince investors that, amongst other things, the Company's business now lacked seasonality. Then, in December of 2004, defendants Landan and Smith made false and misleading statements and omissions within defendants' registration statements/prospectus and prospectus supplements. As early as November of 2004, defendants were aware and actively concealed the fact that the SEC had commenced an informal inquiry into the Company's accounting practices and internal controls, as they related to compensation issues, including stock options.

25.     Defendants concealed information about the SEC inquiry until the end of the Class Period, including the fact that the inquiry posed real prospects for financial restatements, involving one or more quarters. Moreover, defendants concealed the costs of its internal investigation and auditing process, in connection with the inquiry.

26.     As early as March 9, 2005, Company defendants embarked on a further scheme to provide false and misleading financial guidance in furtherance of efforts to maintain an inflated price of the stock through the close of the period in which defendants were obligated to issue registration statements/prospectus and prospectus supplements for the benefit of its reselling convertible noteholders. Through the end of the Class Period, defendants cleverly stated assurances to analysts that the Company was able to achieve ambitious goals and overly aggressive guidance for 2005, including $1 billion in revenues for 2005. Defendants, aware of their false and misleading statements secretly engaged in an evaluation of its operations, as the overall business environment for its

[CORRECTED] COMPLAINT                                                                    -9-

1   products deteriorated. This evaluation determined restructuring costs necessary to realign the

2   Company's business operations with the market during the second half of 2005.

3         27.   Then, on April 28, 2005, defendants boldly increased their previous 2005 annual

4   guidance, serving to affirm prior statements that the Company was continuing in the direction of $1

5   billion in revenues for 2005. Unbeknownst to investors, and in spite of false and misleading positive

6   comments about the Company's Sarbanes-Oxley compliance efforts, defendants' internal controls

7   and corporate compliance was flawed and deficient. Moreover, defendants concealed extraordinary

8   auditing expenses during the Class Period, in connection with the "highly likely" need to restate

9   earnings for multiple quarters and years. Defendants were aware of their flawed and deficient

10   controls and compliance practices from the very beginning of the Class Period and their concealment

11   served to inflate the value of the stock during the Class Period.

12         28.   As a result of the stock price inflation maintained during the Class Period, defendants

13   achieved lucrative executive bonus executive compensation and enhanced employment agreements,

14   serving to discourage insider trading. By concealing the Company's deficient and defective internal

15   controls and corporate compliance, defendants were also able to assure the successful resale of notes

16   by selling holders in connection with its $500 million convertible notes offering pursuant to the

17   Company's registration statement/prospectus and themselves sell $6.3 million in Company stock at

18   inflated prices.

19         29.   Defendants' scheme served to maintain an inflated price of the stock through the end

20   of the convertible notes offering period, followed by false and misleading disclosures serving to

21   remove inflation from the price of the stock. On May 16, 2005, defendants took their first bite out of

22   their inflated 2005 annual guidance. While reporting an "unlimited upside" for every line of its

23   business, defendants positioned their incredible 2005 forecast against reported first quarter EPS

24   growth of 55%, knowing that revenues for the 1Q05 were actually down 5.5 million or over 2%

25   versus 4Q05.

26         30.   Then, on June 13, 2005, defendants resorted to false and misleading responses to

27   questions about the deteriorating business environment faced by enterprise software vendors like

28   Mercury Interactive. Capitalizing on analyst fears about the unwillingness of customers to spend

[CORRECTED] COMPLAINT                                                                    -10-

1   money, defendants created doubts about the Company's guidance and financial performance during

2   the second half of 2005. Although defendants were more than willing to talk the market down with

3   their "speculation" as to the market forces that could undermine their incredible 2005 forecast, at no

4   time did defendant relent in their knowing and active concealment.

5          31.     Finally, on July 5, 2005, defendants finally revealed the shocking news about

6   previously undisclosed accounting irregularities and the Company's ongoing internal investigation

7   and auditing process, a process that had already incurred as much as $1 million in undisclosed

8   expenses. The investment community was finally now in possession of the reasons behind defendant

9   Landan's false and misleading presentations of May 16, 2005 and June 13, 2005. Investors now

10  understood issues at the root of the lowered guidance and negative disclosures, including the

11  Company's review of its business operations "over the past several months". However, defendant

12  continued in their attempts to minimize their disclosures: defendants now explained that the purpose

13  of the undisclosed business operations review was "to position us to execute in the second half of

14  2005", while a corrected press release was required to disclose the highly material fact that "[t]hese

15  actions will result in third quarter restructuring charges".

16         32.     As a result, the price of Mercury Interactive stock tumbled $7.67 or 16.7% from its

17  interim high of $45.88 on May 24, 2005, until the price of the stock bottomed on July 5, 2005.  On

18  the news of July 5, 2005, the price of the Company's stock fell $0.25, to $37.96, on ***unusually heavy***

19  ***volume of 12.2 million shares, nearly six times average volume.***

20         33.     During the Class Period, defendants knew and concealed that the Company:

21                 (a)     employed ***flawed and defective accounting practices and internal controls,***

22  particularly those related to compensation issues, including stock options;

23                 (b)     issued ***false and misleading financial statements and guidance,*** serving to

24  conceal the ramifications of ***an SEC inquiry*** into executive compensation matters;

25                 (c)     faced financial restatements, over at least a two year period;

26                 (d)     had issued untrue, false and misleading financial statements in connection

27  with  the resale of the Company's ***$500 million convertible notes offering;***

28

[CORRECTED] COMPLAINT                                                                    -11-

1           (e)    ***faced mounting costs for its internal investigation and auditing process*** in

2  connection with the SEC inquiry and restatement;

3           (f)    would be ***unable to achieve ambitious goals and aggressive guidance for***

4  ***2005***, despite repeated assurances to the contrary; and

5           (g)    would need to undertake an evaluation of business operations, including

6  ***restructuring costs necessary to realign the Company's business operations with the market*** during

7  the second half of 2005.

8                  **BACKGROUND AND DEFENDANTS' PRE-CLASS STATEMENTS**

9          34.    Mercury Interactive is an enterprise software company that provides software and

10  services to the business technology optimization (BTO) marketplace. Its BTO offerings, known as

11  Mercury Optimization Centers, consist of integrated software, services, and practices that enable

12  companies to use a center of approach to govern the priorities, processes, and people of information

13  technology (IT); deliver and manage applications; and integrate IT strategy and execution. The

14  Company offers products and services in three product lines: IT governance, application delivery,

15  and application management. The company's IT governance offerings are used to prioritize and

16  automate IT business processes from demand through production.

17          35.    Mercury Interactive's software solutions includes regulatory compliance verification

18  software "at the press of a button", including the SOX IT Assessment Accelerator. Information about

19  this software solution appearing on the Company's website is presented here, in pertinent part:

20      ***Mercury Sarbanes-Oxley IT Assessment Accelerator***

21      ***How it Works***

22      External auditors who evaluate management's assessment of internal controls want to
see proof that adequate testing and all necessary remediation has been completed.

23      ***That's where Mercury Sarbanes-Oxley IT Assessment Accelerator can add real
value. At the press of a button, it automatically produces documentation to support***

24      ***this verification.*** Automated scripts reduce the cost of annual testing by more than 30
percent. Auto-documentation also enables Sarbanes-Oxley and quality experts to

25      work collaboratively.

26      With Mercury Sarbanes-Oxley IT Assessment Accelerator, ***you can achieve testing
remediation and visibility with traceability from requirements to defects. Mercury's***

27      ***dashboard offers drilldown and visibility across all Sarbanes-Oxley projects.
Traceability from requirements to defects also automates remediation and ensures***

28      ***complete coverage of all requirements.***

[CORRECTED] COMPLAINT                                                -12-

A Complete BTO Solution

Mercury Sarbanes-Oxley IT Assessment Accelerator is part of Mercury Quality Center™, an integrated suite of applications that automate the processes, controls, audits, and assessments required for sustainable compliance. Quality Center provides automated software testing and quality assurance across a wide range of IT and application environments.

Mercury Sarbanes-Oxley IT Assessment Accelerator and Mercury Quality Center are an integral part of Mercury's overall Business Technology Optimization (BTO) strategy to provide integrated support for SOX compliance across Mercury Optimization Centers™.

36.     Mercury Interactive claims that its application delivery offerings enable customers to optimize custom-built and prepackaged software applications before they go into production. The Company's application management offerings enable customers to optimize business availability and problem resolution, as well as to proactively manage and automate the repair of production problems. In addition, the company provides a range of professional and educational services, as well as customer support offerings that enable partners and customers to implement, customize, manage, and extend its BTO offerings. The Company offers its products and services primarily through its direct sales organization, as well as through inside corporate sales professionals worldwide. The company has strategic alliances principally with Oracle, SAP AG, Siebel Systems, and Accenture.

37.     On April 30, 2003, the Company filed SEC Form 10Q for the quarter ending March 31, 2003. The filing stated in part:

NOTE 8 – SUBSEQUENT EVENT

We sold $500.0 million of Zero Coupon Senior Convertible Notes due 2008 (the Notes) in a private offering. The Notes were offered to investors at 100% of their principal amount. The sale of the Notes closed on April 29, 2003.

The Notes will not bear interest, have a zero yield to maturity, and will be convertible into our common stock at a conversion price of $51.69 per share, subject to adjustment upon the occurrence of specified events. This represents a 43% conversion premium based on the closing price of $36.15 of our common stock on April 23, 2003. Each $1,000 principal amount at maturity will initially be convertible into 19.3461 shares of our common stock. However, holders of the Notes may convert their Notes only if: (1) the sales price of our common stock reaches a specified threshold, or (2) specified corporation transactions have occurred. Upon conversion, we will have the right to deliver cash in lieu of shares of our common stock. We may not redeem the Notes prior to their maturity.

The Notes were placed in a private transaction pursuant to Rule 144A under the Securities Act of 1933. Neither the Notes nor the common stock have been registered under the Act and may not be offered or sold in the United States absent registration or an applicable exemption from the registration requirements of the Act.

\*\*\*

5.    Other Information

On April 29, 2003, Mercury Interactive Corporation completed its sale of Zero Coupon Senior Convertible Notes due 2008 (the "Notes") in a private offering, which offering resulted in net proceeds to the Company of approximately $488.0 million. In addition, Mercury Interactive Corporation granted the initial purchaser of the Notes an option, exercisable through May 9, 2003, to purchase up to an additional $100.0 million aggregate principal amount of the Notes. The Notes were issued pursuant to an Indenture, dated as of April 29, 2003, by and between Mercury Interactive Corporation and U.S. Bank National Association. The Notes and the shares of common stock issuable upon conversion of the Notes have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and may not be offered or sold in the United States absent registration or an applicable exemption from the registration requirements of the Securities Act. Mercury Interactive has agreed in a Registration Rights Agreement, dated as of April 23, 2003, by and between Mercury Interactive Corporation and the initial purchaser of the Notes, for the benefit of the holders of the Notes, to file with the Securities and Exchange Commission a registration statement covering resales of the Notes and the shares of common stock issuable upon conversion of the Notes.

Item 6.        Exhibits and Reports on Form 8-K

(a)            Exhibits

4.1            Indenture, dated as of April 29, 2003, by and between Mercury Interactive Corporation and U.S. Bank National Association related to Zero Coupon Senior Convertible Notes due 2008.

4.2            Registration Rights Agreement, dated as of April 23, 2003, by and between Mercury Interactive Corporation and UBS Warburg LLC related to Zero Coupon Senior Convertible Notes due 2008.

4.3            Amendment No. 3 to Preferred Share Rights Agreement dated April 23, 2003, between Mercury Interactive Corporation and ChaseMellon Shareholder Services, LLC, as successor to Wells Fargo Bank National Association, as rights agent.

10.1            Confirmation regarding Swap Transaction from Goldman Sachs Capital Markets, L.P. dated November 5, 2002.

99.1            Certification of the Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

99.2            Certification of the Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

***

38.    In accordance with the pricing terms of the $500 million in Zero Coupon Senior Convertible Notes due 2008 ("convertible notes"), the 10Q for the quarter ending March 31, 2003 indicated that the Company initially sold its $1000 principal amount notes (19.3461 shares, valued at maturity, at a threshold price of $51.69 per share) to UBS Warburg, LLC, its initial purchaser, at discounted price, with the discount based on the cost of approximately $699.36 (the present value of 19.3461 shares, using defendants' stated closing price of $36.15 on April 23, 2003). Defendants' "conversion premium" of 43% results from the difference between the discounted price and the principal amount ($1000 minus $699.36, or $300.64) divided by the discounted price. Thus, defendants actually sold $1000 denominated convertible notes with an aggregate face value of $715 million, for proceeds of $500 million.

39.    On June 26, 2003, the Company filed SEC Form S-3, containing the preliminary prospectus for "$500,000,000 MERCURY INTERACTIVE CORPORATION Zero Coupon Senior Convertible Notes due 2008 and 9,673,050 Shares of Common Stock Issuable Upon Conversion of the Notes". The Registration Statement/Prospectus stated in part:

SELLING HOLDERS

The Notes were originally issued by us and sold by the initial purchaser in a transaction exempt from the registration requirements of the Securities Act to persons reasonably believed by the initial purchaser to be qualified institutional buyers (as defined in Rule 144A under the Securities Act). Selling holders, including their transferees, pledgees or donees or their successors, may from time to time offer and sell pursuant to this prospectus any or all of the Notes and common stock into which the Notes are convertible.

***

40.    Thus, 9,673,050 shares of Mercury Interactive common stock was issuable upon conversion of the $1000 denominated convertible notes, having an aggregate face value of $715 million, based on a threshold stock price of $51.69. Defendants now undertook to periodically issue an updated prospectus supplement and/or amended registration statement, pursuant to registration statement/prospectus section entitled "REGISTRATION RIGHTS OF THE NOTEHOLDERS" contained within Form S-3 filed on June 26, 2003, stating in part:

[CORRECTED] COMPLAINT                                                                    -15-

The registration statement of which this prospectus forms a part has been filed under the terms of a registration rights agreement, which we entered into with the initial purchaser of the Notes. In the registration rights agreement we agreed, for the benefit of the holders of the Notes and the shares of common stock issuable upon conversion of the Notes, that we would, at our expense:

• file with the SEC, within 90 days after the date the Notes were originally issued, the shelf registration statement of which this prospectus is a part covering resales of the registrable securities; and

• use our reasonable best efforts to cause the shelf registration statement to be declared effective under the Securities Act within 180 days after the date the Notes were originally issued.

We will use our reasonable best efforts to keep the shelf registration statement effective until the earliest of:

• the date when all of the registrable securities have been sold pursuant to the shelf registration statement or Rule 144 under the Securities Act, or any similar provision then in force, but not Rule 144A;

• the expiration of the holding period under Rule 144(k) under the Securities Act applicable to holders that are not affiliates of Mercury Interactive; and

• the date when all of the Notes and the shares of our common stock issuable upon conversion of the Notes have ceased to be outstanding (whether as a result of repurchase and cancellation, conversion or otherwise).

When we use the term "registrable securities" in this section, we are referring to the Notes and the common stock issuable upon conversion of the Notes until the earliest of:

• the effective registration under the Securities Act and the resale of the securities in accordance with the registration statement;

• the expiration of the holding period under Rule 144(k) under the Securities Act for holders that are not affiliates of Mercury Interactive; and

• the sale to the public pursuant to Rule 144 under the Securities Act, or any similar provision then in force, but not Rule 144A.

We may suspend the use of this prospectus under certain circumstances relating to pending corporate developments, public filings with the SEC and similar events. Any suspension period shall not:

• exceed an aggregate of 45 days for all suspensions in any 3-month period; or

• exceed an aggregate of 120 days for all suspensions in any 12-month period.

Notwithstanding the foregoing, we will be permitted to suspend the use of this prospectus for up to 60 days in any three-month period under certain circumstances relating to probable acquisitions, financings, recapitalizations, business combinations or other similar transactions. We need not specify the nature of the event giving rise

[CORRECTED] COMPLAINT                                                    -16-

to a suspension in any notice to holders of the Notes of the existence of such a suspension. Each holder, by its acceptance of the Notes, agrees to hold any communication by us in response to a notice of a proposed sale in confidence.

***

In order to be named as a selling securityholder in this prospectus at the time of effectiveness of the shelf registration statement, a holder must complete and deliver a signed notice questionnaire to us on or prior to the fifth business day before the effectiveness of the registration statement. Upon receipt of a completed questionnaire after that time, together with any other information we may reasonably request following the effectiveness, we will, subject to our rights to suspend the use of the prospectus, within ten business days use our reasonable efforts to add such holder to the shelf registration statement as a selling securityholder by means of a prospectus supplement, if permitted by the SEC; provided that any such failure to file such prospectus supplement will not result in the payment of additional interest and provided, further, that we will have no obligation to add a holder to the shelf registration statement if a post-effective amendment would be necessary to make such addition. If a holder does not complete and deliver a questionnaire or provide the other information we may request, that holder will not be named as a selling securityholder in this prospectus and will not be permitted to sell their registrable securities pursuant to the shelf registration statement.

41.     The terms of the "Registration Rights" afforded the selling holders of the Company's unregistered notes required the Company to periodically issue a prospectus supplement, to periodically update the information contained within the registration statement/prospectus, subject to the requirements and restrictions stated above. Moreover, subject to Rule 144(k) of the Securities Act, defendants were not required to keep their shelf registration effective beyond the two year period4 when the selling holder acquired the notes from the Company's affiliate. Finally, defendants were entitled to "suspend" the prospectus at any time, for the reasons and periods of time stated above, including pending corporate developments, public filings with the SEC and similar events.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

**MADE DURING THE CLASS PERIOD**

42.     On October 22, 2003, the Company issued a press release entitled, "Mercury Interactive Reports Record Revenue of $126 Million - Net Increase in Deferred Revenue: $32.1

---

[4]     Rule 144(k) of the Securities Act of 1933 states: "Termination of certain restrictions on sales of restricted securities by persons other than affiliates. The requirements of paragraphs (c), (e), (f) and (h) of this rule shall not apply to restricted securities sold for the account of a person who is not an affiliate of the issuer at the time of the sale and has not been an affiliate during the preceding three months, provided a period of at least two years has elapsed since the later

million - Earnings Per Share: $(0.08) GAAP; $0.23 Non-GAAP". The press release stated in part:

Sunnyvale, CA – October 22, 2003 – Mercury Interactive Corporation (NASDAQ: MERQ), the global leader in business technology optimization (BTO), today reported results for the third quarter ended September 30, 2003.

Revenue for the third quarter of 2003 was $126.1 million, an increase of 29 percent compared to $97.9 million reported in the third quarter of 2002. Revenue for the first nine months of 2003 was $354.5 million, an increase of 26 percent compared to $282.4 million for the same period in 2002.

Deferred revenue for the third quarter of 2003 increased by $32.1 million from the second quarter of 2003 to $226.0 million. Cash generated from operations for the third quarter of 2003 was $22.2 million compared to $28.0 million in the third quarter of 2002. Net cash generated from operations in the third quarter of 2003 was reduced by $8.0 million of prepaid royalties for the previously announced license of technology from Motive Communications, Inc.

GAAP Results

Net loss for the third quarter of 2003 was $6.7 million, or $0.08 per basic share, compared to a profit of $13.3 million, or $0.15 per diluted share, for the same period a year ago. GAAP results for the third quarter include acquisition related charges of $12.7 million, or $0.13 per diluted share, related to the completion of the Kintana acquisition, as well as $16.9 million, or $0.18 per diluted share, of non-cash impairment charges relating to real-estate consolidation. Net income for the first nine months of 2003 was $28.4 million, or $0.31 per diluted share, compared to $46.5 million, or $0.53 per diluted share, for the same period a year ago.

Non-GAAP Results

Net income for the third quarter of 2003 was $21.3 million, or $0.23 per diluted share, compared to $14.2 million, or $0.16 per diluted share, for the same period a year ago. Non-GAAP earnings per share is calculated using fully diluted shares of 94.0 million. Net income for the first nine months of 2003 was $60.0 million, or $0.66 per diluted share, compared to $39.6 million, or $0.45 per diluted share, for the same period a year ago. Non-GAAP results, as presented in the attached reconciliation table, exclude the following recurring items: expenses from acquisition and restructuring related charges, asset impairment charges related to real estate, gain on early retirement of debt, stock-based compensation and amortization of intangible assets, as well as related income tax provisions or benefits.

On August 15, 2003, Mercury completed its previously announced acquisition of Kintana, Inc. for approximately $225.0 million in cash and stock. GAAP financial results for the quarter include an in-process R&D write-off and acquisition related expenses totaling $12.7 million. In connection with the acquisition of Kintana, and to optimize the work environment for employees and customers, the company intends to move to a new headquarters campus in Mountain View, CA.

---

of the date the securities were acquired from the issuer or from an affiliate of the issuer. The two-year period shall be calculated as described in paragraph (d) of this section."

1    Accordingly, third quarter GAAP results also include a non-cash charge of $16.9 million to reflect the impairment of a portion of the existing Sunnyvale facilities.

2

3    "In the third quarter Mercury had record revenues, strong deferred revenues, and a record number of large transactions, reflecting the adoption of Business Technology Optimization by our customers." said Amnon Landan, chairman, CEO and president of Mercury Interactive Corporation.

4

5    Q3 2003 Highlights

6    Acceleration of business model with term licenses representing a record 46 percent of new product orders

7

8    Strong net increase in deferred revenue of $32.1 million, generated principally from term licenses

9    Record of eight transactions over $1 million

10   Record application management results in both new orders and revenue

11   Largest technology launch in Mercury's history: BTO Technology Blueprint and Mercury Optimization Centers

12

13   Financial Outlook

14   The following financial outlook is provided based on information as of October 22, 2003. Management initiates the following guidance for the quarter ending December 31, 2003:

15

16   Term licenses are expected to be in the range of 43 percent to 47 percent of new product orders

17   Revenue is expected to be in the range of $140.0 million to $148.0 million

18   Net increase in deferred revenue is expected to be in the range of $35.0 million to $45.0 million

19

20   GAAP diluted earnings per share is expected to be in the range of $0.18 to $0.22

21   Non-GAAP diluted earnings per share is expected to be in the range of $0.23 to $0.27

22

23   Cash flow from operations is expected to be in the range of $40.0 million to $55.0 million

24   Non-GAAP guidance is adjusted from GAAP guidance by excluding recurring acquisition and restructuring related charges and stock-based compensation and amortization of intangible assets of approximately $5.0 million.

25

26                                          ***

27       43.    Defendants' press release of October 22, 2003 was false and misleading. First,

28   although defendants provided actual 3Q03 and projected 4Q03 GAAP and non-GAAP financial

1    results, those results were prone to error and manipulation, since defendants' internal controls

2    and compliance practices were deficient and defective, to the extent that they would cause

3    unprecedented auditing activities, culminating in the disclosure of the "very likely" need to

4    restate financial results over multiple quarters and years. Financial statements and guidance

5    resulting from deficient and defective internal controls and compliance practices generally *fail to*

6    *conform to generally accepted accounting practices* ("GAAP"), to the extent of the

7    ineffectiveness of the Company's controls and practices. Finally, to the extent defendants'

8    concealed deficient and defective internal controls and compliance practices resulted in

9    violations of GAAP and false and misleading financial statements and guidance, the Company

10   was at risk of SEC inquiry and investigation.

11        44.    On January 21, 2004, defendants conducted a conference call to report record

12   revenues and cash flow for 4Q03. Defendants stated in part:

13

14        Amnon Landan  - Mercury Interactive - Chairman, President and CEO

15        Good afternoon. Q4 was our best quarter ever. We had record revenues of $152
          million, record growth in the deferred revenues of $54.6 million, and record cash
16        flow from operations of $67 million.

17        In 2003 we made investments (indiscernible) Mercury optimization centers, the
          Mercury brand and our enterprise sales force. Clearly, these investment are
18        delivering results today.

19        During Q4 Mercury crossed another important threshold with 51 percent of product
          orders coming as a term licenses. Our customers continue to shift from buying point
20        tools sold as perpetual licenses to investing in testing in enterprise optimization
          centers sold on a term basis. This resulted in a record 19 deals over $1 million, far
21        exceeding our previous record of 8.

22        Now I would like to review key highlights from the quarter. Every region and every
          product line exceeded their targets in Q4. We believe that our Kintana business has
23        turned the corner in this quarter. IT governance -- as we now call it -- did $11.1
          million in revenues, exceeding our expectations and guidance for growth in the
24        quarter. The combination of our strong offering, new sales leadership, and a high
          level of CIO interest creates the opportunity to make IT governance the fastest-
25        growing part of our business in '04.

26        Mercury's results in application management were again very strong. We grew
          product orders 48 percent over a strong Q4 last year. Clearly we continue to take
27        market share as customers shift spending away from legacy system management to
          investing in business technology optimization.

28

[CORRECTED] COMPLAINT                                                              -20-

Mercury's results in application delivery -- our core testing business -- were impressive. We had strong product order growth of 24 percent over Q4 last year. Customers globally are extending their approach beyond testing to quality and performance at an enterprise level. Mercury's quality and performance centers are the foundation for an enterprise approach to application delivery.

As we had into '04, it is clear that the pressures facing IT executives have never been higher. CIOs are turning to business technology optimization to deliver high-quality business results at a lower cost. Mercury customers are adopting our new optimization centers as the foundation for BTO. As a result of this, we plan to grow new orders and cash flows in the range of 20 to 30 percent in '04.

Mercury has the offerings, brand, channel, and high-caliber people required to become one of the most important partners to our global customers. Last year, was a great year for Mercury and I believe that this year can be even better.

With that, I will turn it over to Doug to review our business model and financial results.

 Doug Smith - Mercury Interactive - EVP & CFO

Thanks Amnon. Once again, the Mercury business model delivered across the board. Total orders grew in excess of 35 percent and our term license mix crossed 50 percent. Fueling this accelerating mix shift was our application delivery business, with term licenses comprising 40 percent of new application delivery product orders. Also contributing was the continued strength in our application management business, accounting for 28 percent of new product orders.

Q4 saw more big deals and a larger percentage of term licenses, yet the average contract length of our deferred revenues remained at 23 months. Additionally, in Q4 several customers renewed their term licenses by making significantly larger commitments and they accounted for many of our deals greater than $1 million.

Over-achievement in new order growth also contributed to the record performance in deferred revenues. Of the $54.6 million increase in deferred revenues, 40 million, or over 70 percent, came from deferred term licenses. This $40 million sequential growth in term licenses represents a significant shift of earnings to the future. Approximately 4.5 million of the increase in deferred revenue was due to the revaluation effects of FX movements.

Total deferred revenue balance for Q4 was $280.6 million, comprised of $212.7 million in short-term deferred revenue and $67.9 million in long-term deferred revenue. Total term licenses in deferred revenue now equals $150 million, or 53 percent, of total deferred revenue, which compares with 38 percent at the end of Q4 a year ago.

All of our major geographies performed well this quarter. America has accounted for 63 percent of our new business, with international contributing the remainder, highlighted by a strong showing in Europe in our application management business. Our partners provided approximately 30 percent of new business in the quarter, with Accenture being the standout performer. The packaged application business represented 27 percent of product orders.

Moving to our metrics on deals, deals over 100,000 exceeded 350 as compared with 240 in Q3 '03 and 250 for the year ago period. Our field average deal size remained

1    at 150,000. We finished the quarter with approximately 270 direct sales teams with
     20 dedicated to IT governance and 40 supporting partners. In addition, we had 135
2    corporate sales teams worldwide.

3    DSOs this quarter increased slightly to 85 days. Approximately 32 days in DSO was
     attributable to the growth in deferred revenue. We again collected over 160 percent
4    of our opening receivable balance, and we kept our over ninety-day percentage to
     below three percent.
5
     Cash from operations this quarter totaled $67 million. This is the real indicator of the
6    strength of our business this quarter.

7    Mercury continues to deliver superior productivity across the organization. Our non-
     GAAP operating margins were 18.8 percent in Q4.
8
     To better assess the progress and quality of our business model, I will share with you
9    the calculation of our operating efficiency ratio which we use as a metric to assess
     our productivity. We measured total operating expenses -- which were $123.4
10   million this quarter -- against our revenue and deferred revenue growth -- which
     totaled $206.6 million in Q4. Calculated on this basis, our margins approach 40
11   percent.

12   Before reviewing guidance, allow me to note that our full year tax rate declined
     modestly to 19.5 percent.
13
     Now, on to guidance for Q1 2004. New orders are expected to grow in the range of
14   22 to 27 percent. We expect the term license mix for new product orders to be in the
     range of 45 to 50 percent. As a result, we expect total revenues to be in the range of
15   145 to $155 million and deferred revenue growth of 10 to $20 million. Depending on
     the revenue and deferred revenue resulting from our term license mix, we expect
16   GAAP EPS to be in the range of 12 to 18 cents and non-GAAP EPS of 17 to 23 cents
     on approximately 98 to 99 million fully diluted shares. Non-GAAP EPS excludes
17   stock based compensation, amortization of intangible assets of $4.1 million, and the
     recurring milestone bonus payment of $1 million. Cash from operations is expected
18   to be in the range of 50 to $60 million.

19        45.     Moreover, defendants introduced new business metrics to highlight and "explain" to

20   analysts that their business had undergone a dramatic transformation, ***such that "seasonality" had***

21   ***been "abolished" from defendant's business model and was no longer a key component in***

22   ***understanding defendants' revenue prospects:***

23

24    John Rizzuto  - Credit Suisse First Boston - Analyst

25   Good afternoon. Very strong quarter. ***Doug, I want to ask you about this new***
     ***metric you're giving us -- new orders.*** I don't believe you have ever given us that
26   guidance before. Could you give us a little more granularity into exactly what that
     is? Is that just -- that's enough.
27
      Doug Smith  - Mercury Interactive - EVP & CFO
28

That's really what we expect to be the new business that we're going to book this quarter.

John Rizzuto  - Credit Suisse First Boston - Analyst

Are your new orders -- are they always visible between the income statement and the balance sheet? Is any of that off the balance sheet that goes into that?

Doug Smith  - Mercury Interactive - EVP & CFO

As I have said publicly on our calls and in our conferences and in our discussions and meetings, we believe that our revenue plus change in deferred revenue *is an excellent proxy for understanding our new business.*

John Rizzuto  - Credit Suisse First Boston - Analyst

*Now, the revenue growth, you're going to 145 to 155. That's fairly strong considering the typical seasonality you experience.* I'm just thinking about the deferred growth of only 10 to 20 million. If I'm not mistaken, although last year's first quarter -- I'm not trying to put words in your mouth -- I'm just trying to understand why this year's guidance is the same as last year's guidance in the third and the total revenue looks to be so much higher. Is there more license coming through there or --?

Doug Smith  - Mercury Interactive - EVP & CFO

John, I think if you note, last year our term license mix was substantially lower than this year -- well below 40 percent. And going into this year, we're saying it's going to be 45 to 50.

Put simply, the 145 to 155 and the 10 to 20 on deferred revenue is really a reflection of the 22 to 27 percent new order growth that we're expecting.

John Rizzuto  - Credit Suisse First Boston - Analyst

Finally, just a little bit on the leverage -- the inherent leverage of the model. The 145 to 155, that would get us right about where we are in this quarter's revenue, but yet we're going to see the operating EPS go down a little bit. What exactly is the places I've got to look at that is going t impact the EPS?

Doug Smith  - Mercury Interactive - EVP & CFO

I think there's three things that you've got to understand about our operating model. First of all, we're running this company to drive our total new business (technical difficulty) that's how we make our decisions about investing in operating expenses. Secondly, we're bringing a breakeven business -- Kintana -- into the P&L and we've got the leverage it. Thirdly, we're investing in new businesses going into 2004 -- Motive -- expanding our footprint in application management. Those are things we are all going to have to get leverage in the course of 2004 and we think we will so that when you look through the year of 2004, as Amnon noted, we would expect to see a similar business model to 2003.

John Rizzuto  - Credit Suisse First Boston - Analyst

Good quarter again. Thanks.

46.      Finally, defendants **reset expectations** by raising the issue that the Company would achieve a triggering event in terms of stock price, for the convertible notes:

Sarah Friar  - Goldman Sachs - Analyst

Doug, just the other area that's come up a lot around you guys is the convertible that obviously you have outstanding. Stock has gone up to an extent where at least from a strike price perspective it looks in the money, but you are giving guidance based on not assuming the convertible to be in the money. How are you talking to the Street and thinking about that going forward?

Doug Smith  - Mercury Interactive - EVP & CFO

Sarah, with respect to the convertible, we characterize the convertible on our balance sheet as debt because, in fact, it does not meet the conditions for conversion.

***Reminding everyone, the conditions for conversion are that the convertible has to trade at or above $56.89 -- 110 percent of the conversion price of the note for 20 of the last 30 trading days of a quarter. That obviously didn't happen in Q4, and as such we reported our numbers that way. It is impossible for me to know whether it's going to happen in Q1, but you can expect that if it does that we would address to the issue when Q1 comes around. So until we know that there is another way to account for this stuff, there's no reason for us to do so.***

Sarah Friar  - Goldman Sachs - Analyst

Thanks a lot.

47.      Finally, defendants pointed to the increased revenue diversification, by pointing to the strength of the Company's business performance in the foreign markets, including Europe and Asia:

Sarah Mattson  - RBC Capital Markets - Analyst

The next quick question on Europe. You mentioned that you did particularly well in Europe. Were there any particular drivers there, and can you give us a sense of the percentage of revenues that was specific to that region, and if there are any currency effects in the quarter?

Amnon Landan  - Mercury Interactive - Chairman, President and CEO

As we mentioned in our comments, our application management business in Europe was especially strong. But we had an extremely strong performance across all of our European regions. Doug, any specifics --

Doug Smith  - Mercury Interactive - EVP & CFO

No doubt our two strongest regions in Europe were the United Kingdom, and then a region we call NSE, North and South Europe, which basically covers the Scandinavian region, Benelux, and Italy, Spain territories. So all of -- those two

regions, which encompasses a lot of territory, France also had a good quarter and Germany delivered solid results as well. Central Europe, I should say. So we had a very balanced portfolio of performance on top of that. And by the way, I'm talking to you when I say that in local currency, and on top of that, UK and North and South Europe had extraordinary performance.

\*\*\*

Rahash Raju  - Robert W. Baird - Analyst

Most of my questions have been answered, but maybe you could add a little more color on your performance in Asia and also performance by vertical markets.

Doug Smith  - Mercury Interactive - EVP & CFO

Our performance in Asia, our Asia-Pac region, which is all of Asia excluding Japan, had significant over-achievement this quarter. We're just starting to build a business in Greater China. So we're really talking about the South Asian marketplace and Australia when we talk about that. We're just starting to build a presence in India when we talk about Asia as well. And Japan was -- we've had a management change in Japan we executed, and as a result there was a slight shortfall in business relative to our expectations. We have put our head of the Asia-Pac region, who has done a wonderful job of building that organization, in charge of running Japan as well, effective with the beginning of the year.

\*\*\*

48.    Defendants' conference call of January 21, 2004 was false and misleading. First, although defendants provided actual 4Q03 and projected 1Q04 GAAP and non-GAAP financial results, those results were prone to error and manipulation, since defendants' internal controls and compliance practices were deficient and defective, to the extent that they would cause unprecedented auditing activities culminating in the disclosure of the "very likely" need to restate financial results over multiple quarters and years. Financial statements and guidance resulting from deficient and defective internal controls and compliance practices generally *fail to conform to generally accepted accounting practices* ("GAAP"), to the extent of the ineffectiveness of the Company's controls and practices.

49.    Moreover, defendants sought to convince investors of reasons for optimism, that the Company could achieve their own aggressive guidance, based on new and confusing business metrics. Defendants sought to "connect" these metrics with their "new business", one that was far less susceptible to seasonality and far more geographically diverse. Finally, defendants built on this scheme to rally investors behind the notion that the Company was within

1   striking distance of a "triggering event" for its convertible notes. However, defendants' efforts to

2   "hype the business" lacked an objective basis and thus were false and misleading. Moreover,

3   defendants concealed their deficient and defective internal controls and compliance practices.

4   Thus, to the extent defendants' deficient and defective internal controls and compliance practices

5   resulted in violations of GAAP and false and misleading financial statements and guidance, the

6   Company was at risk of SEC inquiry and investigation.

7          50.     On July 21, 2004, the Company conducted a conference call to discuss Company

8   earnings for 2Q04. Defendants stated in part:

9          Doug Smith  - Mercury Interactive Corporation - Executive Vice President
           and CFO
10

11          Thanks, Amnon. Revenue for the quarter was a $159 million, *an increase of
           35% as compared to Q2, 2003.* And approximately 3 percentage points of this
           increase is attributable to foreign exchange fluctuations as compared to the previous
12         year. License and subscription revenues totaled $94.6 million or 59% of total
           revenue.
13

14          As Amnon noted earlier we closed several million dollar plus deals, bundling
           all of our products, including IPG. This drove our percentage of subscription license
           business to 45% in Q2 from 41% in Q1, 2004, with nearly $4 million of IPG licenses
15         posted to deferred revenue.

16          Maintenance and professional services revenues totaled $64.5 million or 41%
           of total revenue. The change in deferred revenue was $26.2 million and our deferred
17         revenue balance was $327.3 million at the end of Q2. $15.9 million of the increase in
           deferred revenue came from the growth of the subscription license balance.
18

19          The average length of our deferred revenue balance remains at 23 months. Of
           the total deferred revenue balance $239.8 million was short-term deferred revenue
           and $87.6 million was long-term deferred revenue. Total subscription licenses in
20         deferred revenue, now equals $172.8 million or 53% of total deferred revenue, which
           compares to $157 million or 52% of total deferred revenue at the end of Q1 2004.
21

22          *As Amnon mentioned business across all geographies continues to be
           strong with all regions exceeding targets.* The America's business accounted for
           62% of our business this quarter producing 10 of our 15 deals over $1 million. Our
23         partners provided approximately 39% of our new business in the quarter, which
           compares with 32% in Q1 2004.
24

25          Accenture was the major contributor to this increase and continues to help
           drive new business especially with ITG. Our ISB relationships continue to support
           our ongoing business as well, with our packaged applications business producing
26         23% of product orders. As Amnon noted, custom applications using J2EE and .NET
           played a much stronger role in our growth this quarter. Moving down the P&L total
27         non-GAAP spending for Q2 was a $134.7 million as compared to $130.4 million in
           Q1, 2004.
28

The increase is due to continued expansion of our organization and general corporate purposes. Our non-GAAP operating income was 24.3 million resulting in a 15.3% operating margin. Other income in the quarter was $3 million, net income was $22 million, and pro forma diluted earnings per share was 22 cents as compared with the same number in Q2, 2003 and 24 cents in Q1, 2004.

We continued our investment in global field operations, increasing the number of sales teams around the world by 10 to 293 direct sales teams with 25 dedicated to IT governance and 40 supporting our partners. In addition, we increased our corporate sales organization by 5 to 149 teams worldwide.

On to the balance sheet, the DSO's this quarter increased to 83 days as compared to 72 days in Q1, 2004. And approximately 15 days in DSO was attributable to the growth in our deferred revenues. We collected a 146% of our opening receivable balance and the balance over 90 days was approximately 4% for Q2. And finally, cash from operations this quarter totaled $41.1 million.

***Mercury continues to deliver superior productivity across the organization. Our non-GAAP operating margins were 15.3% in Q2. To better assess the progress and quality of our business model, I will again note the calculation of our operating efficiency ratio, which we use as a metric to assess our ongoing productivity***.

We measure total non-GAAP operating expenses, which were $134.7 million this quarter against the combination of our revenue and deferred revenue growth, which totaled $185.3 million in Q2. Calculated on this basis, our operating efficiency ratio was 27.3%. In our GAAP financials we incurred stock-based compensation and amortization of intangibles of $3.9 million, integration and other related charges of $1.1 million and a gain on investments of $400,000 and non-cash asset impairment charge of $9.2 million related to Mercury's move and to its new headquarters in Mountain View, California.

The cash investments balance totaled $1.4 billion at June 30, 2004 up $58 million from March 31, 2004. Our tax rate for Q2 was 19.5%. Although our tax rate may vary each quarter if viewed over a two to three-year period we expect our tax rate to average 20%.

Now on to guidance for the third quarter and the full year. Revenues are expected to be in the range of a $160 million to $170 million for the third quarter and $665 million to $685 million for the full year. Net increase in deferred revenue in Q3 is expected to be in the range of $20 million to $30 million.

Non-GAAP operating margin is expected to be in the range of 15% to 17% for Q3 and we reiterate our 17% to 20% operating margin guidance for the full year. And GAAP diluted earnings per share is expected to be in the range of 16 to 21 cents for Q3 and in the range of 76 to 85 cents for the full year. And non-GAAP diluted earnings per share are expected to be in the range of 22 to 27 cents for Q3 and $1.04 to a $1.12 for the full year.

This excludes approximately $900,000 of integration and other related charges and $4.2 million of stock-based compensation and amortization of intangibles as respects the third quarter. Fully diluted shares are expected to be in the range of 98 million to 99 million shares for both Q3 and the full year. Cash flows from operation is expected to be in the range of $40 million to $50 million for Q3 and $220 million to $240 million for the full year.

1    One final note. The recently closed Appilog acquisition will result in one-
time charges for in-process research and development in the range of approximately
2    $800,000 to $1 million in the third quarter. Further there will be recurring quarterly
amortization charges in the range of approximately $500,000 to $600,000. We now
3    invite you to ask your questions.

4        QUESTION AND ANSWER

5                                    ***

6        Sarah Friar  - Goldman Sachs - Analyst

7        *Good morning, everyone. Doug, and Amnon just on the subscription
license revenue side first, it fell in the quarter. I just want to understand how that
8    could have come down on a quarter-over-quarter basis. I thought it would always
build given how you recognize subscription revenue.*

9
10       Doug Smith  - Mercury Interactive Corporation - Executive Vice President
and CFO

11       It's probably a timing more of anything else, Sarah, when contracts are
coming through the system. There is *no accounting issue*. There is no economic
12   issue. It's just a recognition of the contracts as they come through the system, you
know, we've got thousands of contracts, some of them falling off, some of them
13   coming on, so it has as much to do with what's going on two years ago as it does this
quarter. There is really no other issue than that.

14                                   ***

15
16       Sarah Friar  - Goldman Sachs - Analyst

17
         *OK. And then just if I might, on your guidance, your guidance show a lot
18   of strength particularly in the back end in the fourth quarter of the year. I'm just
wondering, what gives you that confidence? As you look at the pipeline and given
19   everything we've seen in software this quarter not all of it a pleasant surprise, what
gives you the confidence to kind of guide with such strength particularly in that
20   final quarter? What's the visibility you really had there?*

21       Amnon Landan  - Mercury Interactive Corporation - Chairman, President
and CEO
22
23       We have enjoyed from a business standpoint a very, very strong quarter
across the board. We have as strong a pipeline as any -- we have already closed a
24   number of over $1 million deals this quarter. And as I mentioned before, the value of
what we have to our customers and our competitive position are getting better. And
25   while I was well aware of what other vendors had talked about, the climate and the
enterprise space at the end of the quarter, I must tell you that we had experienced a
26   very robust environment. And, yes, the tail end of June people were difficult to deal
with when you wanted to get large transactions done. But guess what? That's the
27   nature of our - was always the nature of the business and will continue to be the
nature of the business. People are spending money on the right things and we believe
28   based on what we have done and our pipelines and forecasts that we should have a
very, very strong second half.

[CORRECTED] COMPLAINT                                                      -28-

***

John Rizzuto  - CS First Boston - Analyst

OK. And now specifically to the model and the stock, ***you know clearly, the street doesn't seem to like today's numbers. I know even on the revenue and EPS it did come in near the low end of your range, maybe a little below.*** What is, and of course deferred revenue beat -- well our estimates anyway. There is no consensus on deferred revenue growth I suppose.

What is -- I mean, I think this unexpected shifts from balance sheet improvement, a little bit weaker on the income statement or you know, we're going back and forth and that's creating some uncertainty which is I think impacting the stock here. What's the best way - better way we get better, you know, a quarter without an asterisk if you will, where we can say, hey, you know what business is good. We know that. But now let's get the expectations to the model so we can look at the stock price more effectively?

Doug Smith  - Mercury Interactive Corporation - Executive Vice President and CFO

John, it's Doug. You know, first of all, obviously you're right. Our deferred revenue grew faster than we had guided to coming in at $26 million, which obviously implies that we beat our bookings plan. That was what - that's a function of revenue plus change and deferred. What we've tried to suggest to you is that Q4 earnings per share are going to accelerate relative to the previous quarters.

***

Gregg Moskowitz  - Susquehanna Financial Group - Analyst

OK and then naturally there's been a lot of discussion on you know, whether FASB will require inclusion of contingent convertibles and GAAP earnings. So, I just wanted to get your thoughts on that, you know, as it pertains to Mercury?

Doug Smith  - Mercury Interactive Corporation - Executive Vice President and CFO

Right, as we've been on the record saying that we would encourage Wall Street to look at our contingent convertible as equity and ultimately that's how we're going to treat it. In the short term, we continue to treat it as ***debt by virtue of following the current FASB guidelines*** and when we have the opportunity to treat it on an as converted basis we will.

***

Tom Berquist  - Smith Barney - Analyst

OK, and then finally Doug, just on the subscription side there has been some controversy in the industry about whether or not, if these were dollar or daily waiting there, daily accounting for the subscriptions or monthly accounting. How do you guys do it?

Doug Smith  - Mercury Interactive Corporation - Executive Vice President and CFO

[CORRECTED] COMPLAINT                                                          -29-

*We account for our subscription revenue ratably in accordance with the contract terms generally using a daily methodology. We've always believed our subscription revenue accounting to be conservative. And we've reviewed our subscription accounting methodology with PricewaterhouseCoopers who is also our accountant and our audit committee and we are very comfortable that our subscription revenue accounting is in accordance with GAAP.*

\*\*\*

51.     Defendants' conference call of July 21, 2004 was false and misleading. First, although defendants provided actual 2Q04 and projected 3Q04 GAAP and non-GAAP financial results, those results were prone to error and manipulation, since defendants' internal controls and compliance practices were deficient and defective, to the extent that they would cause unprecedented auditing activities culminating in the disclosure of the "very likely" need to restate financial results over multiple quarters and years. Financial statements and guidance resulting from deficient and defective internal controls and compliance practices generally ***fail to conform to generally accepted accounting practices*** ("GAAP"), to the extent of the ineffectiveness of the Company's controls and practices.

52.     Moreover, defendants dealt investors a significant disappointment based on a failure to achieve their own aggressive guidance and confusing business metrics. Defendants first shocked the market with the "disconnect" between subscription and revenue metrics. Then, in the midst of defendants' efforts to "guide up" into 4Q04, defendants assured analysts that there were "no accounting issues", that they were attentive to FASB guidelines and finally that the Company's auditors and audit committee were on top of any issues that could impact GAAP compliance. However, these "explicit assurances" were false and misleading, as defendants concealed their deficient and defective internal controls and compliance practices. Thus, to the extent defendants' deficient and defective internal controls and compliance practices resulted in violations of GAAP and false and misleading financial statements and guidance, the Company was at risk of SEC inquiry and investigation.

53.     On August 4, 2004, the Company filed SEC Form 424B, for Prospectus Supplement No. 5, for the offering of "Zero Coupon Senior Convertible Notes due 2008 and 9,673,050 Shares of Common Stock Issuable Upon Conversion of the Notes". The prospectus supplement undertook to

1    amend and restate in its entirety all information in the section of the Prospectus entitled "Selling

2    Holders".  No other changes to the Prospectus were made, including any changes to information

3    contained under the heading "Risk Factors", regarding the Company's accounting practices, internal

4    controls or the "mix of information" regarding defendants' business prospects on a quarterly basis.

5         54.    Defendants' registration statement/prospectus, as updated by the prospectus

6    supplement of August 4, 2004 contained untrue, false and misleading statements of material fact or

7    omitted to state a material fact required to be stated therein or necessary to make the facts stated

8    therein not misleading, for the following reasons. First, on or before this date, defendants had

9    employed an accounting scheme that failed to conform to generally accepted accounting practices. In

10   particular, those practices and controls associated with compensation, including those related to

11   stock options, were flawed and defective. To ultimately address the issues, a costly and burdensome

12   external audit was required. Once completed, restatement of the Company's financials over a two

13   year period was "highly likely". Defendants' flawed and defective internal controls and corporate

14   compliance issues were not disclosed as "Risk Factors" in the prospectus, or the registration

15   statements and financial statements referenced within.

16        55.    On October 20, 2004, the Company issued a press release entitled, "Mercury

17   Interactive Corporation Reports Third Quarter Results - Revenue $165.4 million; Increase of

18   31% versus Q3 2003 - Net Increase in Deferred Revenue of $19.3 million - Earnings Per Share:

19   $0.21 GAAP; $0.27 Non-GAAP - Cash Flows from Operations: $43.3 million". The press

20   release stated in part:

21
22        Mountain View, CA – October 20, 2004 – Mercury Interactive Corporation
          (NASDAQ: MERQ), the global leader in business technology optimization (BTO),
          today reported results for the third quarter ended September 30, 2004.

23        Revenue for the third quarter of 2004 was $165.4 million, an increase of 31
24        percent compared to $126.1 million reported in the third quarter of 2003.

25        Deferred revenue for the third quarter of 2004 increased by $19.3 million
          from the second quarter of 2004 to $346.6 million. Cash generated from operations
26        for the third quarter of 2004 was $43.3 million compared to $22.2 million in the third
          quarter of 2003.

27

28

[CORRECTED] COMPLAINT                                                              -31-

GAAP Results

Net income for the third quarter of 2004 was $19.0 million, or $0.21 per diluted share, compared to a net loss of $6.7 million, or $0.08 per diluted share, for the same period a year ago.

GAAP results for the third quarter include stock-based compensation and amortization of intangible assets of $4.2 million, integration and other related charges of $1.0 million, a one-time non-cash charge for in-process research and development of $0.9 million, and a net loss on investments of $0.5 million.

Non-GAAP Results

Net income for the third quarter of 2004 was $24.4 million, or $0.27 per diluted share, compared to $21.3 million, or $0.23 per diluted share, for the same period a year ago. Non-GAAP results, as presented in the attached reconciliation table, exclude the following recurring and non-recurring items: stock-based compensation and amortization of intangible assets, integration and other related charges, in-process research and development, a net loss on investments, and a non-cash excess facilities charge.

On July 1, 2004, Mercury completed its previously announced acquisition of Appilog for $51.5 million in cash as well as assuming all of Appilog's outstanding options. This acquisition resulted in a one-time charge for in-process research and development of $0.9 million and amortization of intangible assets of $0.5 million, both of which are included in the previously mentioned GAAP results.

"We are very pleased with our strong results this quarter," said Amnon Landan, chairman and CEO at Mercury. "Mercury is in a large and growing market, customers are increasing their investments in our BTO offerings, and we continue to execute."

Stock Buyback

On July 28, 2004, Mercury announced that its board of directors had approved a new program to repurchase up to $400 million of the company's common stock over the next two years. The specific timing and amount of repurchases will vary based on market conditions, securities law limitations and other factors. As of September 30, 2004, 9,675,000 shares had been repurchased for $332.2 million, with an average all-in cost per share of $34.33.

Financial Outlook

The following financial outlook is provided based on information as of October 20, 2004, and Management assumes no duty to update this guidance. Management provides the following guidance for the fourth quarter and full year ending December 31, 2004:

Revenue for the fourth quarter is expected to be in the range of $185 million to $195 million.

Net increase in deferred revenue for the fourth quarter is expected to be in the range of $40 million to $50 million.

1        Non-GAAP operating margin is reiterated for the full year to be in the range of 17 percent to 20 percent.

2

3        GAAP diluted earnings per share for the fourth quarter is expected to be in the range of $0.28 to $0.34.

4        Non-GAAP diluted earnings per share for the fourth quarter is expected to be in the range of $0.32 to $0.38. This excludes approximately $300,000 of integration and other related charges and $4.0 million of stock-based compensation and amortization of intangibles.

5

6

7        Fully diluted shares are expected to be in the range of 87.5 to 89.5 million for the fourth quarter and 93 to 95 million for the full year.

8        Cash flows from operations for the fourth quarter is expected to be in the range of $60 million to $70 million.

9

10        Non-GAAP guidance is adjusted from GAAP guidance by excluding the following recurring and non-recurring items: stock-based compensation and amortization of intangible assets, integration and other related charges, in-process research and development, a net loss on investments and a non-cash excess facilities charge.

11

12

13        Based on the recent issuance of EITF 04-08, "The Effect of Contingently Convertible Debt on Diluted Earnings per Share", beginning in the fourth quarter of 2004 we will include 9,673,050 shares in our fourth quarter and full year weighted average share calculation. Our fourth quarter 2004 earnings per share guidance will be affected by this increase in shares on a GAAP and non-GAAP basis of $0.03 to $0.04. Our full year 2004 earnings per share guidance will be affected by this increase in shares on a GAAP basis of $0.07 to $0.08 and on a non-GAAP basis of $0.10 to $0.11.

14

15

16

17                                          \*\*\*

18   78.    Defendants' press release of October 20, 2004 was false and misleading. First, although

19   defendants provided actual 3Q04 and projected 4Q04 GAAP and non-GAAP financial results, those

20   results were unreliable, since defendants' financial statements and guidance ***actually failed to***

21   ***conform to generally accepted accounting practices*** ("GAAP"). As the underlying cause of any

22   failure to conform to GAAP rests with one or more defective and deficient elements of the

23   Company's internal controls and compliance practices, the Company's financial statements and

24   guidance were potentially prone to errors and manipulation, to the extent of the ineffectiveness of the

25   Company's controls and practices. Finally, the extent of defendants' concealment of (i) deficient and

26   defective internal controls and compliance practices, (ii) violations of GAAP and  (iii) false and

27   misleading financial statements and guidance would potentially subject the Company to SEC inquiry

28   and investigation.

56.     On December 1, 2004, defendant Smith made a presentation to the NASDAQ 13th Investor Program. Defendant Smith stated in part:

Good afternoon, all. Thank you for your time. I will try to be efficient with the use of it.

We all know this; this is a first step in becoming Sarbanes-Oxley compliant.

And I think many of you may know that Mercury is currently positioning itself as the leader in so-called Business Technology Optimization. And I will take a couple of seconds. Well, what is business technology optimization all about? It's really about the shift in IT organizations going to running (technical difficulty) like a business. And I think (technical difficulty) time in the '80s when manufacturing-based companies realized that they had huge pockets of waste and inefficiency and drags on their profits coming about from their manufacturing organization. A manufacturing organization for a bank is its IT organization. And it's where the knowledge factory resides. And trying to optimize the value that that IT optimization creates is really the essence of what Business Technology Optimization is all about.

***

(technical difficulty) Company for the better part of since 1994. During that intervening decade Mercury has grown at compound growth rate. If you did the CAGR on this it would be about 44 percent through 2004. We're pretty proud of that. The numbers in yellow, as you can see, refer to as we started to roll out our managed service business in 2000 and started selling our products on a subscription basis, first of all, in the application management business in 2000 -- 2000 we started selling our application management business as a subscription and our testing products we started selling -- excuse me, on a subscription basis. In 2003, we started creating a perpetual and deferred revenue model. And that's what those lines speak to, such that if you look at the numbers on the far right hand side, that reflects our Q4 guidance. It says the revenue will be somewhere in the range of 666 to 676, and that total change in deferred revenue for the year will be roughly 106 to 116 million of revenue.

The way to think about that is that's really a reflection enough what our new orders were during the course of the year. So when we get an quarter from a customer, we invoice that customer for that PO that we receive, and it either goes into the income statement as revenue or onto the balance sheet because it's a subscription or a maintenance order as deferred revenue. And that's what gives rise to that. So if you took the midpoint of that, that says that we are telling you we think we're going to do somewhere in the range of $780 million or so in new orders this year, which compares to roughly 625 a year ago, which is roughly a 25 percent year-over-year growth rate in terms of new orders, and some of that going to the income statement and the balance sheet.

Some of the other facts I think we already heard in introduction about Mercury. We do still have $1.1 billion in cash, even though we bought back roughly $332 million of our stock in the third quarter when the stock took a big hit and went down to around -- I think we were able to buy it at $34. I hope some of you could too.

Selling model -- starting to shift; critical to continuing that business moving forward from 780 million to $1 billion. That would be sort of the ambition that we have as we going into 2005 and beyond. What we started in 2003 was to introduce the notion of a strategic account manager. That's somebody who is responsible for 1, 2 or 3 key accounts and really developing the whole account in its entirety, whether that be IT governance or -- I don't know if this is supposed to -- there it is. Whether it be IT governance, application delivery or application management, the point is there are strategic account managers sell all of our products to these strategic accounts. They have fairly substantial quotas. And we had 10 of them around the world in 2003. We have roughly 40 of them in the field actively in 2004. And we expect that we will have a significantly larger number of them in the 2005. And clearly the whole idea of these guys is to kind of go after Mercury's what we call mile wide and inch deep customer base. We have got 20,000 customers; 19,500 of them know that they're customers of ours and the rest of them we have to sort of make sure they know -- become customers of ours. It's really trying to penetrate more deeply those customers with that suite of products.

***

Let me tell you that on the revenue side of things here -- we have an incredible amount of data on our website, www.mercury.com. You'll see everything there is about this presentation, about other presentations, all of our financials, 12 quarters worth of data at the line item level by business, by geography. *It's all there for you. It is a very significant supplemental section. We kind of try to do the best job we can to make as much of our data transparent as possible. Just go to the company information page, go to the IR section, and it's all there -- all the taped earnings calls and stuff like that.* I would point out that Amnon does from time to time do keynote speeches. He's doing 1 tomorrow as well. That will be on the Web. And presumably the presentation that we saw today or variations of it are also on the Web.

I will leave you with the thought that Mercury is a 25 percent plus growth company. That's how it's going to grow, by driving further penetration of the testing business into making testing a more strategic part of the solution that the IT organization uses to deliver quality performance and reliability to their business partners. I think we talked at length about the IT governance business today and the fact that there's a strategic shift to distributed Web-based applications is opening a huge opportunity for Mercury in the system management business is what gives rise to our growing 40 percent plus in the application management business.

***

57.     The presentation of defendant Smith on December 1, 2004 was false and misleading. Despite his claims regarding the "transparency" of the Company's reporting practices, defendant Smith already knew that the SEC had already opened an informal inquiry in November 2004, into the Company's accounting practices and internal controls, as they related to compensation issues, including stock options. For this reason alone, defendant Smith knew that the accuracy of the Company's financial reports was subject to the uncertainties and issues presented by the SEC inquiry, including the potential for financial restatements, for one or more quarters. Moreover, since

these SEC issues actually occurred at an earlier time, market knowledge of the inquiry would adversely impact sales of the Company's convertible notes. Rather than admit to analysts that the Company was now the subject of SEC scrutiny and that the costs to address these issues could be significant, defendant Smith concealed his knowledge of the issues, choosing instead to discuss the Company's prospects for continued growth.

58.     On December 2, 2004, defendant Landan made a presentation to the Mercury at Credit Suisse First Boston Technology Conference. Defendant Landan stated in part:

Amnon Landan  - Mercury Interactive - Chairman & CEO

Thank you, John. Good afternoon. Hopefully you enjoyed lunch. So I'm going to talk a little bit more about what we see happening in the industry overall, what are the drivers that in my mind influence how IT organizations are going about their business, where they spend their money. Clearly all of those have a lot of impact on Mercury. And then spend some time on connecting the dots -- how this impacts us. And then I'll tell you what our bookings are for Q4 year-to-date.

***

Governance and compliance -- Sarbanes-Oxley and (indiscernible) and Basel II. And then all the nice internal things like Six-Sigma and ISO and CMN (ph) and ITIL and all the other good stuff is putting a significant burden on organizations. And the numbers are fairly significant. This year, $5.5 billion spent on SOX; 4 billion spent in Europe on Basel II. But it's actually way beyond those numbers.

And if I look at Mercury's sales, *as we are now in the home stretch of becoming SOX compliant,* all of my IT organizations, all of my finance organizations are doing two shifts a day. They have a day job and they have a SOX job. And I'm not exaggerating. And it's the same in many, many other companies. This forces a totally different approach and discipline on IT organizations. Right now, everyone is trying to patch it. But next year, organizations are going to take a much more methodical (indiscernible) way to deal with these compliance demands. Because all these compliance requests end up being around governing IT. As we said before, the IT is the business, so on and so forth. So all these regulations end up into make sure that you control the environments and the processes that you have in your IT and technology environment. I think next year, the notion of governance and specifically compliance is going to be a key, key driver for the growth of our IT governance business.

***

Moderator

 I know you mentioned large deals, so I just want to follow up. And I know you don't want to give any projections today. But do you expect this large deal trend that you've experienced better than any company in my coverage universe, which is

1    pretty broad, do you expect that to continue? I mean would that be something that we
2    would look at and expect to see these large deals continue to accelerate?

3     Amnon Landan  - Mercury Interactive - Chairman & CEO

4     There was a real transition over the last six quarters. We used to have two to four
     deals over $1 million every quarter. Now we have 60 to 20 over the last few quarters.
5     Yes, this trend should continue. And frankly, one of the things that we should do is to
     balance and we'll continue to have a transaction of business on one hand. And to that
6     extent, we are investing heavily in our corporate sales organization and they are
     doing an amazing job in servicing -- not necessarily the low end of the market, but
7     the additional sales into the customer base. And at the same time, extending the high-
     end channel, which is the strategic account managers. And often going into next
8     years to continue and extend on those two fronts. And as a result, I believe we
     continue -- we should continue and see a large number of bigger deals.

9                                                              ***

10          59.    The presentation of defendant Landan on December 1, 2004 was false and

11   misleading. Despite his claims that the Company was **"in the home stretch of becoming SOX**

12   **compliant"**, defendant Landan already knew and concealed that the SEC had opened an informal

13   inquiry in November 2004, into the Company's accounting practices and internal controls, as they

14   related to compensation issues, including stock options. For this reason alone, defendant Landan

15   knew that the accuracy of the Company's financial reports was subject to the uncertainties and issues

16   presented by the SEC inquiry, including the potential for financial restatements, for one or more

17   quarters. Moreover, since these SEC issues actually occurred at an earlier time, any market

18   knowledge of the inquiry would adversely impact sales of the Company's convertible notes. Rather

19   than admit to analysts that the Company was now the subject of SEC scrutiny and that the costs to

20   address these issues could be significant, defendant Landan also concealed his knowledge of the

21   issues, choosing instead to discuss the Company's prospects for continued growth.

22          60.    On December 2, 2004, the Company filed SEC Form 424B, for its Prospectus

23   Supplement for the offering of "Zero Coupon Senior Convertible Notes due 2008 and 9,673,050

24   Shares of Common Stock Issuable Upon Conversion of the Notes". The prospectus supplement

25   undertook to amend and restate in its entirety all information in the section of the Prospectus entitled

26   "Selling Holders".  No other changes to the Prospectus were made, including any changes to

27   information contained under the heading "Risk Factors", regarding the Company's accounting

28

1    practices, internal controls or the "mix of information" regarding defendants' business prospects on a

2    quarterly basis.

3            61.    Defendants' registration statement/prospectus, as updated by the prospectus

4    supplement of December 2, 2004 contained untrue, false and misleading statements of material fact

5    or omissions of material facts required to be stated therein or necessary to make the facts stated

6    therein not misleading, for the following reasons. Defendants already knew that the SEC had already

7    opened an informal inquiry in November 2004, into the Company's accounting practices and internal

8    controls, as they related to compensation issues, including stock options. Moreover, defendants knew

9    that the accuracy of the Company's financial reports was subject to the uncertainties and issues

10   presented by the SEC inquiry, including the potential for financial restatements, for one or more

11   quarters. None of these "Risk Factors", pointing to defendants' concealment of its wayward

12   accounting scheme, questionable internal controls and the SEC inquiry into these matters were

13   included as an update to defendant's prospectus.

14           62.    On December 21, 2004, the Company filed SEC Form 424B, for Prospectus

15   Supplement for the offering of "Zero Coupon Senior Convertible Notes due 2008 and 9,673,050

16   Shares of Common Stock Issuable Upon Conversion of the Notes". The prospectus supplement

17   undertook to amend and restate in its entirety all information in the section of the Prospectus entitled

18   "Selling Holders".  No other changes to the Prospectus were made, including any changes to

19   information contained under the heading "Risk Factors", regarding the Company's accounting

20   practices, internal controls or the "mix of information" regarding defendants' business prospects on a

21   quarterly basis.

22           63.    Defendants' registration statement/prospectus, as updated by the prospectus

23   supplement of December 21, 2004 contained untrue, false and misleading statements of material fact

24   or omissions of material facts required to be stated therein or necessary to make the facts stated

25   therein not misleading, for the following reasons. Defendants already knew that the SEC had already

26   opened an informal inquiry in November 2004, into the Company's accounting practices and internal

27   controls, as they related to compensation issues, including stock options. Moreover, defendants knew

28   that the accuracy of the Company's financial reports was subject to the uncertainties and issues

presented by the SEC inquiry, including the potential for financial restatements, for one or more quarters. None of these "Risk Factors", pointing to defendants' concealment of its wayward accounting scheme, questionable internal controls and the SEC inquiry into these matters were included as an update to defendant's prospectus.

64.     On January 24, 2005, the Company issued a press release entitled, "Mercury Interactive Corporation Reports Preliminary Fourth Quarter Results - Increasing Revenue and Earnings Estimates". The press release stated in part:

> Mercury Interactive Corporation (NASDAQ: MERQ), the global leader in business technology optimization (BTO), today announced preliminary financial results for the fourth quarter ended December 31, 2004.

> Mercury expects total revenue for the fourth quarter of 2004 to be in the range of $203 million to $205 million, which exceeds previously provided guidance of $185 million to $195 million. The increase in deferred revenue for the fourth quarter of 2004 is expected to be in the range of $63 million to $66 million, which exceeds previously provided guidance of $40 million to $50 million.

> GAAP diluted earnings per share for the fourth quarter of 2004 is expected to be in the range of $0.34 to $0.36. Non-GAAP diluted earnings per share for the fourth quarter of 2004 is expected to be in the range of $0.40 to $0.42. In both GAAP and Non-GAAP diluted earnings per share estimations, fully diluted shares were approximated in the range of 97.7 million to 98.7 million, which takes into consideration the recent issuance of EITF 04-08, "Effect of Contingently Convertible Debt on Diluted Earnings per Share". Mercury's previously provided guidance of GAAP diluted earnings per share of $0.28 to $0.34 and Non-GAAP diluted earnings per share of $0.32 to $0.38 were both expected to be reduced by $0.03 to $0.04, due to the inclusion of the EITF.

> Non-GAAP results for the fourth quarter of 2004 exclude stock-based compensation and amortization of intangibles and integration and other acquisition related charges in the range of $4.1 million to $4.4 million, a non-cash adjustment to excess facility charge of approximately $0.2 million and net gain on investments of approximately $0.1 million.

> ***Mercury cautions that these results are preliminary, based on the information currently available, and are subject to the closing of its books and completion of its accounting procedures and determination of final accounting adjustments.***

> "We are very pleased with our strong performance in the fourth quarter and full year 2004," said Amnon Landan, chairman and CEO at Mercury. "We would like to thank our customers and partners for their continued investment in Mercury's BTO offerings.

> ***

[CORRECTED] COMPLAINT                                                          -39-

65.     The press release of January 24, 2005 was false and misleading for the following reasons. Even as defendants cautioned that they had yet to complete their accounting procedures, defendants already knew that their accounting procedures and practices were already the subject of an SEC inquiry. Defendants knew and concealed the fact that the SEC had already opened an informal inquiry in November 2004, into the Company's accounting practices and internal controls, as they related to compensation issues, including stock options. For this reason alone, defendants knew that the accuracy of the Company's financial reports was subject to the uncertainties and issues presented by the SEC inquiry, including the potential for financial restatements, for one or more quarters.

66.     On February 2, 2005, following the release of its final financial results for the 4Q04, defendants conducted a conference call to discuss these results. Defendants stated in part:

Amnon Landan  - Mercury Interactive Corporation - Chairman & CEO

Thank you for joining us. In Q4 we had record revenue, deferred revenue growth and earnings. We had strong results across all product lines. In Q4, we grew revenue by 54 percent and non-GAAP EPS by 68 percent versus Q4 '03. For 2004, revenue grew by 35 percent and non-GAAP EPS by 28 percent, compared to 2003. Mercury continues to demonstrate leadership in all areas of the Business Technology Optimization market. Clearly, Q4 was our best quarter ever and '04 was our best year. Now, let's review some of the drivers behind our success.

Our investments in building enterprise solutions, brand, and channels are paying off. During the quarter, we closed 24 deals over $1 million; yet another new record. For the year, we did 70, which is almost double the number from last year. In '04, we materially expanded our relationship with Accenture, and they standardized on our IT Governance products for internal usage. Today, most of the leading outsourcers have established Mercury Centers of Excellence. Additionally, SAP is now including our products as part of their service offering for optimizing SAP Net Weaver, which will introduce us to thousands of their customers over time. In '04, we expanded our product and service offerings with the Mercury optimization centers. Each center is a suite of software products, imbedded best practices and services for optimizing the quality performance and availability of business-critical applications.

***

*In closing, Mercury remains one of the very few growth companies left in the technology industry. As I look forward to '05, it is clear that the opportunity in front of us is as big as ever; actually bigger. IT's importance in the economy is expanding; the need to govern IT resources, optimize applications and meet compliance demands have never been higher. This positions us in the IT spending sweet spot. With that, I will turn it over to Doug.*

Doug Smith - Mercury Interactive Corporation - EVP & CFO

 Thanks, Amnon. Revenue for the quarter was $204.3 million, an increase of 34 percent as compared to Q4 2003. Approximately 4 percentage points of this increase were attributable to foreign exchange fluctuations as compared with the previous year. License and subscription revenues totaled $128 million, 63 percent of total revenue. Maintenance and professional services revenues totaled $76.3 million, 37 percent of total revenue.

***Looking out over our geographies, the Americas accounted for 61 percent of our revenues; Europe, Middle East, and Africa 31 percent, and Japan and Asia contributing 8 percent. Revenue for the year ended December 31, 2004, was $685.5 million, an increase of 35 percent when compared to the year ended December 31, 2003. The change in deferred revenue was $67.7 million for the quarter, bringing the deferred revenue balance to $414.3 million. Of the increase, $24.9 million came from the net growth of subscription license balances. The dollar weighted average length of our subscription revenue balance remains roughly flat at 22 months.***

***

Now on to guidance for the first-quarter 2005. Revenue for the first quarter is expected to be in the range of $190 million to $200 million. Net increase in deferred revenue for the quarter is expected to be in the range of 5 to $15 million. GAAP diluted earnings per share for the first quarter is expected to be in the range of $0.26 to $0.32. Non-GAAP diluted earnings per share for the third quarter -- excuse me, for the first quarter -- is expected to be in the range of $0.28 to $0.34.

Fully diluted shares outstanding for this quarter is expected to be in the range of 98 million to 100 million shares, which takes into consideration the recent issuance of EITF '04-'08, effective contingently convertible debt on diluted earnings per share. Non-GAAP guidance for first-quarter of 2005 is adjusted from GAAP guidance by excluding stock-based and amortization of intangible assets of $4 million, and a gain on sale of our [Idol] building of approximately $300,000.

Guidance for the full-year of 2005. New order growth, revenue plus change in deferred revenue, for the full year is expected to be in the range of 20 to 25 percent. Revenue growth for the full year is expected to be in the range of 28 to 32 percent. Non-GAAP operating margins for the full year are expected to be in the range of 20 to 21 percent. GAAP diluted earnings per share for the full year is expected to be in the range of $1.36 to $1.46, and non-GAAP diluted earnings per share for the full year are expected to be in the range of $1.45 to $1.55.

Lastly, cash flow from operation also grow in the range of 25 to 30 percent. Non-GAAP guidance for the full year is adjusted from GAAP guidance by excluding stock-based compensation and amortization of intangible assets of $15.8 million, and a gain on the sale of our Idol building of approximately 300,000 dollars. Lastly, I want to remind you that a detailed Q4 2004 earnings presentation and supplemental schedules are available on the main investor relations page of the Company's website. We now invite you to ask your questions.

***

Gregg Moskowitz - Susquehanna Financial Group - Analyst

[CORRECTED] COMPLAINT                                                    -41-

Okay. Thank you. And I will add my congratulations. Looking across the regions, obviously, there was pretty good strength across the board. Europe did seem to look - - did seem to show the biggest improvement, sequentially. I know you have struggled previously in Central Europe. Maybe you could just talk a little bit about what you saw in Europe this quarter, and Central Europe, specifically.

Amnon Landan - Mercury Interactive Corporation - Chairman & CEO

***Europe was our star in Q4. We did good on all regions, we did great in many of the regions, but Europe, they had a hell of a performance, even when you back out the currency impact. They had a break-up quarter in local currencies and specifically to your question, in Central Europe, we brought in a new leader to round that territory a few months ago and we had better-than-expected performance and are very optimistic about our future in that part of the globe.***

***

67.     Defendants' report and comments during the conference call of February 2, 2005 was false and misleading for the following reasons. First, defendants already knew that the SEC had already opened an informal inquiry in November 2004, into the Company's accounting practices and internal controls, as they related to compensation issues, including stock options. For this reason alone, defendants knew that the accuracy of the Company's financial reports was subject to the uncertainties and issues presented by the SEC inquiry, including the potential for financial restatements, for one or more quarters. Moreover, the issues behind the SEC inquiry actually occurred prior to November 2004, any market knowledge of the inquiry would adversely impact sales of the Company's convertible notes. Rather than admit to analysts that the Company was now the subject of SEC scrutiny and that the costs to address these issues could be significant, defendants concealed their knowledge of the issues, choosing instead to issue aggressive guidance for continued growth.

68.     On March 9, 2005, defendant Smith addressed the Lehman Brothers Global Software, IT Services & Internet Conference. Defendant Smith stated in part:

Good morning, everyone. I suppose this will probably be fairly straightforward for many of view, as I look across the room. ***At one level it kind of is indicative of the fact that we haven't felt compelled to need to change very much, because clearly our focus has been on the fact that technology has been at the centerpiece of change in the business of many of the financial services companies, retail, pharmaceutical companies, and telecom service providers around the world. It has been a very beneficial place to be for Mercury over the last several quarters.***

We believe there is a set of directional activities that are going on that are just merely accelerating these trends. So our job is to really ride these waves and maximize the opportunity that is in front of us that we have yet to really capitalize on.

\*\*\*

Lastly and one that has really shown up more in the course of 2004, is the overall focus on managing IT like a business and addressing to the compliance challenges that IT organizations, as well as finance organizations, have encountered, as the world of compliance is becoming increasingly demanding and an increasingly demanding world, as well as one taking on a much higher priority and focus for both the chief information officer as well as the chief financial officer, not to mention all of the executive officers of the company. ***Just finishing up my SOX compliance process this week. So we can spend a minute talking about that later.***

\*\*\*

On the compliance and governance side, I know Mercury just spent several million dollars. We estimated that we spent over 14,000 hours internally, direct, with all the people in accounting and finance and IT and HR over the last six months. We have hope successfully implementing our 404 compliance activities, documenting over 900 controls that run our business. You just take that and explode that around the world and it is obviously a huge effort to overcome. Those 14,000 hours had to come, for example, from people who all had day jobs as well.

So the impact I believe on most finance and IT organizations around the world was significant. I think what we realized as we were doing it, and I suspect many other companies, is that driving a compliance project is not unlike driving an IT project. ***That when you get these changes in regulations, when you get these changes in policies, whether that be banking regulations, pharmaceutical regulations, or SEC regulations in the case of 404 SOX, you have to both -- it causes you to impact your business and it causes you to not only document your business processes, but frankly change many of them in order to assure that you're going to be able to meet the regulations that are in place.***

\*\*\*

I think for most of the people in this room, they know that Mercury has been an up and to the right company for many years now, 2004 being yet another one, where we delivered at $686 million of revenue and added another $134 million to our balance sheet in the form of deferred revenue. ***We are certainly giving you a sense that in 2005 we're going to be able to continue this sustained growth that would have us moving in the direction of $1 billion. This was the guidance that we provided in January; and obviously I wouldn't be putting it up here if I didn't think we were going to do it.***

We're being very -- relative to the last two years, as the comparables get more challenging and the numbers get bigger, the laws of the math works, we're basically giving you our conservative view of where we see the business growing from a new order standpoint. Revenue growth and new order growth, clearly, while net revenue growth exceeds new order growth, what I would tell you is that when you look at the fact that we have got $300 million of business sitting on short-term deferred revenue, and you look at the yield that we got from our bookings in 2004, that became current-quarter revenue -- and you should be able to figure all that out -- if you just extend that forward into 2005, and you add that to the $312 million, you would not

be surprised to find out that revenue is growing faster than bookings in the model that we have got here.

***As revenue grows faster, then P&L margins, so-called operating margins, will improve in 2005 -- that is evidenced in the guidance we gave of 20 to 21% --and correspondingly have an impact on our earnings going from $1.09 to the range that we are offering you now of $1.45 to $1.55. As we catch up on some working capital movements that we had in 2004, we didn't collect as much in the U.S. as we had historically from a percentage balance and over 90 (ph) standpoint, we think we ought to get some benefit of that back in 2005 with the management changes and the focus changes we have made in the U.S. collections team; and as a result see cash flows grow a little faster than bookings as well.***

I just want to make sure at the end of this that I remind you that in 2005 we will continue to be investing in building our business, as we grow out our strategic account management groups; as we look to build out our relationships with our partners around the world; as we look to become more aggressive, investing in the continent of Europe and in Asia, in particular in China and India. With Tony Zingale, our President and Chief Operating Officer, on board we feel very optimistic that we can realize some significant benefits from those investments as we move forward beyond that.

We are accelerating our R&D investment in application management as we look at the changed management market and leverage our Appilog business that we acquired in 2004. As we double down on the ITG business in 2005 that we began to build. And lastly I will remind you that we are spending a lot of R&D money and focus on helping to integrate the Optimization Centers so that we can deliver these as more integrated solutions to our customers, and that is what they have been asking of us for.

***Of course, we are seeking to build out the management team and invest in people around the country. I think we added roughly 350 people in 2004, and I would not be surprised if we continue to invest at that level in 2005.*** No tuck-ins are currently sitting in my pocket to tuck in, but we will continue to look at areas where we can enhance our capabilities in IT Governance, application management, and our application delivery business. We explore the number of partnerships in that direction.

***

69.     Defendant Smith's remarks of March 9, 2005 were false and misleading for the following reasons. First, defendant Smith already knew that the SEC had already opened an informal inquiry in November 2004, into the Company's accounting practices and internal controls, as they related to compensation issues, including stock options. ***Incredibly, defendant Smith pointed out that his SOX compliance process would be completed by week's end.*** This highly deceptive, false and misleading remark pointed to the lack compliance issues at the Company, at a time when the Company continued to deal with audit and compliance activities triggered by the SEC inquiry. Defendant Smith knew that the accuracy of the Company's financial reports was subject to the

1    uncertainties and issues presented by the SEC inquiry, including the potential for financial

2    restatements, for one or more quarters. Moreover, he knew that the issues behind the SEC inquiry

3    actually occurred prior to November 2004, and that any market knowledge of the inquiry would

4    adversely impact sales of the Company's convertible notes. Rather than admit to that the Company

5    was now the subject of SEC scrutiny and that the costs to address these issues could be significant,

6    defendant Smith concealed their knowledge of the issues, choosing instead to issue aggressive

7    guidance for continued growth.

8        70.    Moreover, as CFO, defendant Smith was in a position to know firsthand if the

9    Company was slipping against its ambitious goals and aggressive guidance. Smith reiterated this

10   guidance during his March 9, 2005 address, stating that the Company was moving in the direction of

11   $1 billion in revenues for 2005. Defendant Smith added, "[t]his was the guidance that we provided in

12   January; and obviously I wouldn't be putting it up here if I didn't think we were going to do it".

13   Nevertheless, these comments stand in stark contrast with the fact that defendants undertook many

14   months of review of their business operations, a review that could reasonably trigger restructuring

15   costs during the second half of 2005,[5] predicated on defendants' knowledge of trends and business

16   progress that could not have supported a $1 billion revenue number for 2005.

17       71.    On April 28, 2005, defendants issued a press release entitled, "Mercury Interactive

18   Corporation Reports First Quarter Results - Revenue of $198.8 million for the quarter; Growth of

19   27% versus Q1 2004 - Net Increase in Deferred Revenue of $2.6M - Earnings Per Share: $0.32

20   GAAP; $0.34 Non-GAAP – Cash Flows from Operations: $72.1 million". The press release stated in

21   part:

23       Mercury Interactive Corporation (NASDAQ: MERQ), the global leader in business
24       technology optimization (BTO), today announced financial results for the first
         quarter ended March 31, 2005.

25       Revenue for the first quarter of 2005 was $198.8 million, an increase of 27 percent
26       compared to $156.8 million reported in the first quarter of 2004.

---

[5]     See ¶ 89.

[CORRECTED] COMPLAINT                                                              -45-

Deferred revenue for the first quarter of 2005 increased by $2.6 million from the fourth quarter of 2004 to $417.0 million. Cash generated from operations for the first quarter of 2005 was $72.1 million compared to $62.0 million in the first quarter of 2004.

"Q1 was a strong start for the year," said Amnon Landan, CEO at Mercury. "Customers continue to invest in our solutions and leverage our broad and flexible portfolio of BTO offerings."

GAAP Results

Net income for the first quarter of 2005 was $31.4 million, or $0.32 per diluted share, compared to $18.9 million, or $0.18 per diluted share, for the same period a year ago.

Diluted earnings per share was calculated taking into consideration the recent issuance of EITF 04-08, "Effect of Contingently Convertible Debt on Diluted Earnings per Share." Net income was adjusted for debt related costs on an 'as if' converted basis by $0.4 million for the quarter. Fully diluted shares were 99.4 million shares for the quarter ended March 31, 2005. Previously reported net income and diluted earnings per share for the first quarter ended March 31, 2004 have also been restated based on the effect of EITF 04-08.

Non-GAAP Results

Non-GAAP net income for the first quarter of 2005 was $33.8 million, or $0.34 per diluted share, compared to $23.8 million, or $0.22 per diluted share, for the same period a year ago. Non-GAAP results for the first quarter of 2005, as presented in the attached reconciliation table, exclude the following items: stock-based compensation and amortization of intangibles related primarily to previous acquisitions of $4.0 million; a gain on a sale of a vacant facility of $0.3 million; a gain on investment of $1.0 million; a net loss on investments in non-consolidated companies and warrant of $0.3 million; and related tax effect of the items above.

Based on the effect of EITF 04-08, non-GAAP net income and fully diluted shares were also adjusted in the calculation of diluted earnings per share by the same amounts GAAP diluted earnings per share were adjusted. In addition, previously reported non-GAAP net income and diluted earnings per share for the first quarter ended March 31, 2004 have been restated.

Financial Outlook

The following financial outlook is provided based on information as of April 20, 2005 and management assumes no duty to update this guidance.

Management provides the following guidance for the second quarter of 2005:

Revenue for the second quarter is expected to be in the range of $205 million to $215 million;

Net increase in deferred revenue for the second quarter is expected to be in the range of $20 million to $30 million;

GAAP diluted earnings per share for the second quarter is expected to be in the range of $0.30 to $0.34;

Non-GAAP diluted earnings per share for the second quarter is expected to be in the range of $0.33 to $0.37; and

Fully diluted shares outstanding for the second quarter is expected to be in the range of 99 million to 101 million, which takes into consideration the issuance of EITF 04-08, "Effect of Contingently Convertible Debt on Diluted Earnings per Share."

Non-GAAP guidance for the second quarter of 2005 is adjusted from GAAP guidance by excluding stock-based compensation and amortization of intangible assets related primarily to previous acquisitions of $3.9 million.

***Management reiterates the full year 2005 guidance as provided on February 2, 2005, except that it increases the following full year 2005 guidance:***

***GAAP diluted earnings per share for the full year is expected to be in the range of $1.41 to $1.48***

***Non-GAAP diluted earnings per share for the full year is expected to be in the range of $1.50 to $1.57***

***Non-GAAP guidance for 2005 is adjusted from GAAP guidance to exclude the following items: stock-based compensation and amortization of intangible assets related primarily to previous acquisitions of $15.8 million, a gain on investments of $1.0 million, a net loss on investment in non-consolidated companies and warrant of $0.3 million and a gain on a sale of vacant facilities of $0.3 million; and related tax effect of the items above.***

72.     Defendants' press release of April 28, 2005 was false and misleading for the following reasons. First, defendants continued to actively conceal compliance issues at the Company, at a time when the Company continued to deal with audit and compliance activities triggered by the SEC inquiry. Secondly, and more importantly, defendants hyped their business by making the deliberate decision to raise guidance for 2005, in spite of the fact that revenue was down more ***than 2% or $5.5 million versus the prior quarter.*** Thus, not only was defendants' decision to increase guidance an absolutely incredible development, defendants provided ***no objective basis whatsoever for increasing their guidance for 2005.***[6] If anything, the Company's lackluster performance for 1Q05 signaled the beginning of ***pretty bleak picture*** for Mercury Interactive and other enterprise software vendors.

---

[6]     On May 2, 2005 and then again on May 12, 2005, defendants filed SEC Form POS AM, to deregister a $113,885,000 aggregate principal amount of the Zero Coupon Senior Convertible Notes due 2008 (including the underlying 2,203,231 shares of common stock) which remained unsold by

## THE TRUTH IS REVEALED

73. On May 16, 2005, defendant Landan addressed the JPMorgan 33rd Annual Technology Conference, to seeking to convince analysts why they **ought to ignore reality and adopt a bullish view of Company's prospects and incredible 2005 guidance,** stating in part:

> So the key question is Mercury was so far clearly a growth company. Why should it continue to be a growth company and **when the backdrop around enterprise software is pretty bleak and clearly Q1 was yet another kind of a wakeup call on the heels of Q2 of last year.** And the short version is the following. Where I started with the premise that IT organizations are going to restructure themselves, all of them between now and five to seven years down the road. If you don't buy into this thesis. then probably we are a bad investment. We do buy into this. We believe in it. We see this on a daily basis.
>
> **As they grow through this transformation we look at every one of our lines of business, and we only see is an unlimited upside.** On the application delivery, on the testing side, already talked about us growing, the Indian offshore growing, people are taking a more strategic approach to quality of performance using centers of excellence and the fact that the vast majority of the applications are still not being tested and they will be tested because they are all interconnected, and that is the key issue here. You can no longer say these three applications are more business critical and I'll ignore the others. They all connect, they all share data. And as we move into more advanced technologies like service oriented architectures its going to be even worse.
>
> On the application management we are in the beginning of a cycle where people are moving away from infrastructure management to application management to assure business continuity. A small fraction of the market have made the leap. the whole market is yet to follow; everyone now is of the opinion that they will. We are in the driver seat on that one. And IT governance again that is kind of the linchpin of this whole transformation, and it is not even in the first inning. We're still in spring training with that one. And what IDC Mercury's BTO message is in tune with the top of mind issues facing IT executives today and I am almost done.
>
> Few financial highlights, Q1, we had a good Q1. No one said great quarter in Q1 in the (indiscernible) hall, maybe everyone was still hanging (ph) over from all the misses, but we thought we had a good quarter. **Revenues close to $200 million growing 27%. EPS grew 55%.** Record number of deals over $1 million, just four, six quarters ago we used to have a handful of those deals. We had 19 and the average deal size is growing significantly. We are successful in enterprising Mercury. It is still a small part of our overall business, so we have a very nice balance here. And strong performance in the Americas, in our AM business, J2EE part and the result of our managed service organization. And close to 2800 employees.

the selling holders during the time the Company agreed to keep its Registration Statement Effective. Both post-effective amendments were signed by defendants Landan, Smith, Zingale, and Skaer.

[CORRECTED] COMPLAINT                                                                         -48-

1   Quick comment about guidance. For the year we have guided for booking growth of
    20 to 25%, revenue growth around 30%, EPS of $1.50 to $1.57 **which is around**
2   ***40%,*** Op margins 20 to 21% and cash flow from OpEx (ph) growth of 25% to 30%.
    And here you have any number you would ever like to know and with this I would
3   ask Doug to join us here and we will be happy to answer questions.

4         74.    Defendant Landan's attempts to justify the Company's increased 2005 guidance of

5   April 28, 2005, on the basis of his beliefs alone, lacked an objective basis and was therefore false

6   and misleading.   Although indicative of an ***"unlimited upside"*** for the Company's business,

7   Landon's comments actually served to guide the price of the stock downward, for the following

8   reasons. First, while Landon pointed to EPS growth of 55% for 1Q05, this claim made no sense

9   whatsoever, in light of the fact that ***1Q05 revenue growth actually decreased $5.5 million versus***

10  ***4Q04.*** Secondly Landon used his incredible assertions to estimate EPS growth for 2005 at ***around***

11  ***40%.*** Finally, since there analysts were already questioning the "spending environment" faced by

12  enterprise software vendors, Landon's puffery about "business continuity", "linchpins" and

13  "innings" could not carry the weight of his incredible numbers.

14        75.    Moreover, Landan's statements aided in defendants' continued concealment of the

15  Company's ongoing internal audit activities in connection with their deficient and defective internal

16  controls and corporate compliance. By this time, the mere fact that defendants had accumulated

17  undisclosed audit-related expenses approaching $1 million was material, even if the potential for

18  financial restatements was only "highly likely".

19        76.    Landon and defendants continued in their active and knowing concealment, while

20  aware or in conscious and reckless disregard of their liability to shareholders and purchasing holders

21  of Mercury Interactive convertible notes. In light of this, defendant Landan stuck to his story,

22  leaving analysts to do the math and conclude that there was no logical reason to accept the false and

23  misleading guidance and forecasts defendants had provided.

24        77.    Then, on June 13, 2005, defendant Landan addressed the Goldman Sachs Bus Tour.

25  During the event, defendant Landon commented on the mix of business the Company enjoyed from

26  a geographical standpoint, stating in part:

27

28

[CORRECTED] COMPLAINT                                                          -49-

A few words about where we get the businesses from. Still heavily biased towards the Americas. ***Europe is a significant chunk and we have an opportunity to do even more.*** (inaudible) Japan and Asia-Pacific is really in its infancy; this number should be much higher than 10%, but we have a lot of work to do over there, especially in Japan. ***You can see the growth rate, and the non Americas should grow faster in order to gain their fair market (indiscernible) percentage of the business.*** Generate their fair share of the business for us. Overall we have 2,700 people at the end of Q1.

\*\*\*

I always tend to look first and foremost at the demand equation, and we just happen to be in a place that on paper the demand equation is extremely unique in every one of the markets and in the overall opportunity. The challenge for us is to (inaudible) and to execute. ***No gimmes, but (technical difficulty) the demand picture is very very favorable for us I believe for the next quite a few years.***

Snapshots of '05, Q1 revenues plus $200 million, $0.34, which was 55% (ph) growth. A record 90 (ph) deals over $1 million. ***And in Q1, which is an indication that we have become more strategic to our customers, we deal with more senior people and they make more strategic bets on our solutions.*** The strengths in Q1 were the Americas' performance, our AM (ph) business, our J2EE, and the results of our managed service organization.

***(inaudible) guidance for the year, booking growth of 20 to 25%; revenue growth of 28 to 32%; and (indiscernible) balance sheet. EPS $1.50 to $1.57 range. Operating margin 20 to 21%; and cash flow from operation (indiscernible) at 25 to 30%.*** If you have binoculars you can read this slide. (inaudible) slides. Good. So now we can go into Q&A.

\*\*\*

78.     Defendant Landan again provided his spin on ***positive guidance*** for 2005 fiscal year, including revenue growth ***approaching a phenomenal 32%.*** Moreover, Landan pointed to ***non-Americas*** growth, with an opportunity to do even more business in Europe. However, when challenged with specific questions pointing to the general business environment, Landan finally began to waver, signaling to analysts that they indeed should consider the negative implications of the changing business environment.

79.     However, defendant Landon continued to conceal the truth about (i) the Company's lackluster growth prospects; (ii) the fact that there was no objective basis whatsoever for the Company's increased 2005 annual guidance; (iii) the continuing active concealment of the Company's deficient and defective internal controls and corporate compliance, as well as related and growing auditing costs; and (iv) the fact that the Company would now need to consider restructuring, as well as costs and charges associated with those downsizing activities.

80. Thus, Landon's response to analysts concerned about the general business environment served to further defendants' concealment, as Landon reached for an answer cleverly based on *factors such as "seasonality", as well as back-loaded quarters and years, as manifestations of the current business environment:*

Unidentified Speaker

We will just let everyone ask as we go along. But maybe I would just start by asking question that everyone (indiscernible). Right now, the June quarter of a year ago caused a lot of angst for a lot of software companies, actually. In fact, you guys had great bookings growth in June of a year ago. (inaudible) you looked to the expenses (ph) and talk about the environment today, what are you seeing from the customers that you go out and talk to? Are they more upbeat? Do you think you are still very reticent to spend? Or are they (indiscernible) spending? *Has the environment gotten worse?*

Amnon Landan  - Mercury Alliances - Chairman and CEO

*I am going to give you an answer that would not make any of you happy.* To my mind, since the end of the nuclear winter around September '03, all conditions are the same. While there are small fluctuations, they are the same. Because slight fluctuation might have an impact on companies' performance (indiscernible) quarters are Q2 of last year, Q1 of this year, where the industry had a real challenging year. And conversely Q4 of last year or Q (indiscernible) of last year was (indiscernible) allegedly very robust. The market environment has not changed.

In my mind people are very cautious in what they spend. They want to see a much shorter-term ROI. They need to justify investment. By the way, part of the drivers for them (indiscernible) governance and demand (inaudible) to justify investments. Customers are in a more (indiscernible) much stronger position versus the vendors, compared to the tail (ph) of the bubble. That's life, and I don't think it is good or bad. That is the way it is, and that is the way I expect it to continue.

I don't know that I can -- people invest. Unlike the nuclear winters through '00 till mid '03, or '01 to mid '03 where it was, keep the lights on and (inaudible). People do invest in new initiatives because they have to. That is probably the major reason why they have spent so much money on IT. But they are very, very structured, focused, and methodical about how they spend a dollar. (inaudible) try to do this within a salary cap; so they try to (indiscernible) office of the organization into another one.

*If you look at the trends, probably I might make a generic statement about the industry, that we see more seasonality. Back-end loaded quarters and years, which again is kind of a manifestation of my biggest (ph) comments about the diligence and (indiscernible) of the customers.*

***

81. Thus, Landan first told analysts that they had reason to expect stellar business performance from the Company, and then cleverly switched the message, warning of *quarterly and year-end revenue misses, due to "seasonality" and the "back-end loaded" nature of quarters and*

1    years. While the investment community was again left to its own conclusions to decipher Landan's

2    doublespeak, the market reaction was decidedly negatively. Although Landan was well aware of his

3    continued concealment of ongoing internal audit activities, significant undisclosed audit-related

4    expenses, the potential for financial restatements and plans for business restructuring, analysts

5    remained in the dark about these details. The price of Mercury Interactive's stock, having already

6    lost nearly 7.6% of its value from its interim high of $45.88 on May 24, 2005, now accelerated its

7    downward slide. In the 2 day period immediately following Landan's negative disclosures, the price

8    of Mercury Interactive stock dropped $2.34 or 5.5%, to close on June 14, 2005 at $40.03, on a

9    combined volume of 7.8 million shares.

10           82.     Finally, on July 5, 2005, defendants caused the issuance of a "corrected" press release

11   entitled, "Mercury Interactive Corporation Reports Preliminary Second Quarter Results". The press

12   release stated in part:

13           Press Release Source: Mercury Interactive Corporation

14           /C O R R E C T I O N -- Mercury Interactive Corporation/

15           Tuesday July 5, 9:03 am ET

16           In the news release, "Mercury Interactive Corporation Reports Preliminary
             Second Quarter Results," issued today, July 5, by Mercury Interactive Corporation
17           over PR Newswire, we are advised by the company that the quote in the second
             paragraph should end with the following sentence, "These actions will result in third
18           quarter restructuring charges."

19               Complete, corrected text follows:

20             Mercury Interactive Corporation Reports Preliminary Second Quarter
             Results
21
               MOUNTAIN VIEW, Calif., July 5 /PRNewswire-FirstCall/ -- Mercury
22           Interactive Corporation (Nasdaq: MERQ - News), the global leader in business
             technology optimization (BTO), today announced that based on its preliminary
23           review of its second quarter results, it expects to achieve between $200.0 million and
             $205.0 million in revenues for the second quarter of 2005, compared to the guidance
24           of $205.0 million to $215.0 million which Mercury gave in its April 20, 2005 press
             release. Mercury expects that its non-GAAP fully diluted earnings per share for the
25           second quarter will be between $0.30 and $0.35, compared to the non-GAAP
             earnings per share guidance of $0.33 to $0.37 in the April 20, 2005 press release.
26           Mercury expects that its change in deferred revenue will be between zero and $10.0
             million, below the guidance of $20.0 million to $30.0 million in the April 20, 2005
27           press release. This new range takes into account the expected revaluation of deferred
             revenue due to foreign exchange movements and a shortfall in new orders in the
28           second quarter. The April 20, 2005 non-GAAP earnings per share guidance for the

second quarter had been adjusted to exclude the following GAAP items: stock based
compensation and amortization of intangible assets related primarily to previous
acquisitions of $3.9 million. The new non-GAAP earnings per share estimates also
exclude $16.0 million which Mercury expects to incur in the second quarter for the
write down of certain technology related to a license from Motive, Inc. and certain
other expenses discussed below.

"The disappointing second quarter results are due primarily to a shortfall in
Europe," stated Mercury Chairman and Chief Executive Officer Amnon Landan.
"Mercury has a large market opportunity, strong competitive position, and global
customer base. *We have also been engaged over the past several months in a
thorough review of our business operations and are now taking proactive actions
to position us to execute in the second half of 2005. These actions will result in
third quarter restructuring charges.*"

*In response to an informal inquiry of the Securities and Exchange
Commission entitled In the Matter of Certain Option Grants, which was initiated
by the SEC in November 2004, the Company's Board of Directors has appointed a
Special Committee consisting of disinterested members of the Audit Committee to
conduct an internal investigation relating to past stock option grants. The Special
Committee is being assisted by independent outside legal counsel and accounting
experts. Mercury continues to fully cooperate with both of these inquiries.*

*These inquiries could cause the Company to restate its financial statements
for prior periods. Both the SEC inquiry and the Special Committee investigation
are ongoing. Mercury is unable to determine at this time whether a restatement
will be necessary, and if so, the years affected and the amounts involved. The
Company does not believe that a restatement would have an impact on its historical
revenues, cash position, or non-stock option related operating expenses.*

*The Company estimates that it has incurred approximately $1.0 million of
unanticipated expenses in the second quarter of 2005 for both the Special
Committee investigation and the SEC inquiry, which are excluded in the non-
GAAP earnings per share estimates being provided in this press release.*

*The Company assumes no duty to update the information contained in this
press release.*

\*\*\*

83.    The shocking news pointed to previously undisclosed accounting irregularities,
resulting in an internal investigation and auditing process at the Company, a process that had already
incurred *as* much *as $1 million in undisclosed expenses.* Moreover, defendants concealed from
investors both the November 2004 SEC inquiry triggering this process and by failing to provide
guidance regarding those costs defendants undertook in response to the inquiry, of the Company's
*Special Committee, independent outside legal counsel and accounting experts.* Moreover, since the
internal investigation and audit was an ongoing process, its costs would reasonably continue to

1  mount, in light of the fact that **the Company remained unable to tell investors which reporting**

2  **periods would require restatement and the amounts involved.**

3      84.    The investment community was now in possession of the reasons behind defendant

4  Landan's false and misleading presentations of May 16, 2005 and June 13, 2005. Investors now

5  understood issues at the root of the lowered guidance and negative disclosures, including the

6  Company's review of its business operations "over the past several months". Although Landan now

7  explained that the purpose of the undisclosed review was "to position us to execute in the second

8  half of 2005", a corrected press release was required to disclose the highly material fact that **"[t]hese**

9  **actions will result in third quarter restructuring charges".**

10      85.    Thus, not only had defendants withheld guidance regarding the cost of its internal

11  investigation and audit in connection with an SEC inquiry, defendants also withheld highly material

12  information regarding the desperate state of its business operations, in contrast with defendants' mid-

13  quarter decision to increase guidance and Landon's dubious and highly transparent affirmation of

14  that guidance on two subsequent occasions. However, Landon's scheme worked, in that his

15  disclosures had already caused Mercury Interactive stock to fall as much as $7.67 or 16.7% from its

16  interim high of $45.88 on May 24, 2005.  On the news of July 5, 2005, the price of the Company's

17  stock fell $0.25, to $37.96, on volume of 12.2 million shares, nearly six times average volume.

18      86.    The almost 17% decline in Mercury Interactive's stock price within the final weeks of

19  the Class Period was a direct result of the unraveling of the nature and extent of defendants' fraud

20  finally being revealed to investors and the market. The timing and magnitude of Mercury

21  Interactive's stock price decline negate any inference that the loss suffered by plaintiff and other

22  Class members was caused by changed market conditions, macroeconomic or industry factors or

23  Company-specific facts unrelated to the defendants' fraudulent conduct. During the same period in

24  which Mercury Interactive's stock price fell almost 17% as a result of defendants' fraud being

25  revealed, the Standard & Poor's 500 securities index was flat. The economic loss, i.e., damages,

26  suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent

27  scheme to artificially inflate Mercury Interactive's stock price and the subsequent significant decline

28

[CORRECTED] COMPLAINT                                                    -54-

1  in the value of Mercury Interactive's stock when defendants' prior misrepresentations and other

2  fraudulent conduct was revealed.

3         87.    During the Class Period, defendants knew and concealed that the Company:

4         (a)    employed ***flawed and defective accounting practices and internal controls,***

5  particularly those related to compensation issues, including stock options;

6         (b)    issued ***false and misleading financial statements and guidance,*** serving to

7  conceal the ramifications of ***an SEC inquiry*** into executive compensation matters;

8         (c)    faced financial restatements, over at least a two year period;

9         (d)    had issued untrue, false and misleading financial statements in connection

10  with  the resale of the Company's ***$500 million convertible notes offering;***

11         (e)    ***faced mounting costs for its internal investigation and auditing process*** in

12  connection with the SEC inquiry and restatement;

13         (f)    would be ***unable to achieve ambitious goals and aggressive guidance for***

14  ***2005***, despite repeated assurances to the contrary; and

15         (g)    would need to undertake an evaluation of business operations, including

16  ***restructuring costs necessary to realign the Company's business operations with the market*** during

17  the second half of 2005.

18  **POST-CLASS PERIOD REVELATIONS AND ALLEGATIONS BEARING ON**
   **SCIENTER AND/OR MATERIALITY**

19

20         88.    As if to underscore the truth regarding the Company's effective concealment of

   adverse business and financial issues from its prior guidance, on July 6, 2005, Forbes published an
21
   article entitled "Department Mercury Interactive Hurt By Aggressive Guidance". The article stated
22
   in part:
23
       Credit Suisse First Boston maintained an "outperform" rating on Mercury
24       Interactive (nasdaq: MERQ - news - people ) after the company warned that fiscal
   second-quarter earnings would be weaker than expected. CSFB lowered the stock's
25       price target to $44 from $50. Estimates for 2005 were cut to earnings of $1.46 per
   share on revenue of $846 million from $1.54 on revenue of $883 million. "We do not
26       believe there is a 'problem' with end-market demand or the size of Mercury's
   opportunity. Although the second quarter was below our estimates, the company still
27       grew bookings between 8% and 16% year-over-year. We believe this miss was
   ***caused by aggressive guidance,*** a reliance on larger transaction sizes and the double
28       whammy of a weaker Europe and a negative F/X impact. Some of the weakness in

Europe can be attributed to sales management changes, which can be remedied in the next few quarters," the research firm said. CSFB now puts bookings growth at 8% to 10%, versus previous guidance of 20% to 25% and lowered its 2005 bookings revenue estimate to $880 million from $984 million. The research firm concluded: ***"As for guidance, we believe management would be well served by backing out the contribution from larger deals as the company is still in a transition to a solution sales organization."***

89.    Although hesitant to "confirm" their findings, defendants finally spoke of the materiality of the restatements they now faced, over a period of quarters and years, pointing to repeated violations of GAAP. On August 8, 2005, defendants published a press release entitled, "Mercury Interactive Corporation to Delay Filing of Form 10-Q". The press release stated in part:

MOUNTAIN VIEW, Calif., Aug. 8 /PRNewswire-FirstCall/ -- Mercury Interactive Corporation (Nasdaq: MERQ - News), the global leader in business technology optimization (BTO), today announced that it will not be in a position to timely file its Form 10-Q for its second quarter ended June 30, 2005, which is due on August 9, 2005.

As previously disclosed, Mercury's Board of Directors has established a Special Committee consisting of disinterested members of the Audit Committee to conduct an internal investigation relating to past stock option grants. Also as previously disclosed, the Special Committee has reached a preliminary conclusion that the actual date of determination for certain past stock option grants differed from the stated grant date for such awards, which would result in additional charges to Mercury for stock-based compensation expenses. The Special Committee is continuing its investigation, and has not yet determined the exact magnitude of the additional expenses to be incurred or the specific periods affected. Based on the Special Committee's preliminary determination, ***Mercury believes, but has not yet concluded that (i) such changes are highly likely to be material and (ii) it is highly likely that Mercury will need to restate its historic GAAP financial statements.*** Accordingly, Mercury is not in a position to file its Form 10-Q for the second quarter until (1) the Special Committee has reported results of its investigation to the Board of Directors, (2) Mercury has reached a final conclusion as to the need to restate its financial statements, and (3) all necessary restatements relating to periods covered by the Company's presently effective Form 10-K report have been made. Mercury is unable to determine at this time when the Special Committee will report on its investigation to the Board of Directors.

As previously disclosed, Mercury does not believe that any restatement will have an impact on its historical revenues, cash position or non-stock option related operating expenses. Mercury intends to complete any required restatements and to file its Form 10-Q for the second quarter as soon as practicable following the Special Committee's report to its Board of Directors.

### DEFENDANTS' CLASS PERIOD STOCK SALES

90.    During the Class Period, the following defendants sold their shares in accordance with the following schedule:

| Insider | Title | Shares | Trade Date | Avg. Price | Total |
|---|---|---|---|---|---|
| LEBLANC BRYAN | VP, Fin. & Ops. | 3000 | 1/3/2005 | $45.61 | $136,844.70 |
| | | 1000 | 2/1/2005 | $43.60 | $43,602.70 |
| | | 1000 | 3/1/2005 | $45.92 | $45,918.60 |
| | | 1000 | 4/1/2005 | $47.43 | $47,427.80 |
| | | 1000 | 5/2/2005 | $41.27 | $41,270.00 |
| | | 7000 | | | $315,063.79 |
| MURPHY D. J. III | Sr. VP, Corp Dev | 15000 | 12/9/2004 | $44.22 | $663,352.49 |
| | | 5000 | 1/24/2005 | $41.45 | $207,254.01 |
| | | 5000 | 2/15/2005 | $47.52 | $237,579.00 |
| | | 5000 | 3/15/2005 | $46.36 | $231,798.00 |
| | | 5000 | 4/15/2005 | $43.17 | $215,849.99 |
| | | 5000 | 5/16/2005 | $41.66 | $208,300.00 |
| | | 40000 | | | $1,764,133.49 |
| SCARLAT YUVAL | Sr. VP, Products | 70000 | 12/2/2004 | $46.07 | $3,225,129.14 |
| SKAER SUSAN J | VP, General Counsel | 2000 | 12/1/2004 | $45.31 | $90,620.00 |
| | | 4000 | 1/3/2005 | $45.61 | $182,459.59 |
| | | 2000 | 2/3/2005 | $47.66 | $95,324.00 |
| | | 2000 | 3/1/2005 | $45.94 | $91,872.00 |
| | | 4000 | 4/1/2005 | $47.23 | $188,920.39 |
| | | 2000 | 5/20/2005 | $45.00 | $90,000.00 |
| | | 2000 | 6/1/2005 | $45.00 | $90,000.00 |
| | | 18000 | | | $829,195.99 |
| Totals | | 135000 | | | $6,133,522.41 |

## FALSE FINANCIAL STATEMENTS

91.    The financial statements issued by Mercury Interactive during the Class Period and the statements about them were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting in violation of GAAP and SEC rules.

92.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R. §210.4-01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

1    93.    Due to these accounting improprieties, the Company presented its financial results

2  and statements in a manner which violated GAAP, including the following fundamental accounting

3  principles:

4         (a)    The principle that interim financial reporting should be based upon the same

5  accounting principles and practices used to prepare annual financial statements was violated (APB

6  No. 28, ¶10);

7         (b)    The principle that financial reporting should provide information that is useful

8  to present and potential investors and creditors and other users in making rational investment, credit

9  and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

10        (c)    The principle that financial reporting should provide information about the

11 economic resources of an enterprise, the claims to those resources, and effects of transactions, events

12 and circumstances that change resources and claims to those resources was violated (FASB

13 Statement of Concepts No. 1, ¶40);

14        (d)    The principle that financial reporting should provide information about how

15 management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

16 for the use of enterprise resources entrusted to it was violated.  To the extent that management offers

17 securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

18 accountability to prospective investors and to the public in general (FASB Statement of Concepts

19 No. 1, ¶50);

20        (e)    The principle that financial reporting should provide information about an

21 enterprise's financial performance during a period was violated.  Investors and creditors often use

22 information about the past to help in assessing the prospects of an enterprise.  Thus, although

23 investment and credit decisions reflect investors' expectations about future enterprise performance,

24 those expectations are commonly based at least partly on evaluations of past enterprise performance

25 (FASB Statement of Concepts No. 1, ¶42);

26        (f)    The principle that financial reporting should be reliable in that it represents

27 what it purports to represent was violated.  That information should be reliable as well as relevant is

28 a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

1        (g)     The principle of completeness, which means that nothing is left out of the

2 information that may be necessary to insure that it validly represents underlying events and

3 conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

4        (h)     The principle that conservatism be used as a prudent reaction to uncertainty to

5 try to ensure that uncertainties and risks inherent in business situations are adequately considered

6 was violated.  The best way to avoid injury to investors is to try to ensure that what is reported

7 represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

8        94.     Further, the undisclosed adverse information concealed by defendants during the

9 Class Period is the type of information which, because of SEC regulations, regulations of the

10 national stock exchanges and customary business practice, is expected by investors and securities

11 analysts to be disclosed and is known by corporate officials and their legal and financial advisors to

12 be the type of information which is expected to be and must be disclosed.

13

14 **APPLICABILITY OF PRESUMPTION OF RELIANCE**

15 **FRAUD-ON-THE-MARKET DOCTRINE**

16        95.     At all relevant times, the market for Mercury Interactive securities was an efficient

17 market for the following reasons, among others:

18        (a)     Mercury Interactive's stock met the requirements for listing, and was listed

19 and actively traded on the NASDAQ, a highly efficient and automated market;

20        (b)     As a regulated issuer, Mercury Interactive filed periodic public reports with

21 the SEC; and

22        (c)     Mercury Interactive regularly communicated with public investors via

23 established market communication mechanisms, including through regular disseminations of press

24 releases on the national circuits of major newswire services and through other wide-ranging public

25 disclosures, such as communications with the financial press and other similar reporting services.

26        96.     As a result of the foregoing, the market for Mercury Interactive's securities promptly

27 digested current information regarding Mercury Interactive from all publicly available sources and

28 reflected such information in Mercury Interactive's stock price.  Under these circumstances, all

1   persons who purchased or acquired Mercury Interactive's securities during the Class Period suffered

2   similar injury through their purchase of the aforementioned securities at artificially inflated prices

3   and a presumption of reliance applies.

4                                    **NO SAFE HARBOR**

5          97.   The statutory safe harbor provided for forward-looking statements under certain

6   circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

7   Many of the specific statements pleaded herein were not identified as "forward-looking statements"

8   when made.  To the extent there were any forward-looking statements, there were no meaningful

9   cautionary statements identifying important factors that could cause actual results to differ materially

10  from those in the purportedly forward-looking statements.  Alternatively, to the extent that the

11  statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are

12  liable for those false forward-looking statements because at the time each of those forward-looking

13  statements was made, the particular speaker knew that the particular forward-looking statement was

14  false, and/or the forward-looking statement was authorized and/or approved by an executive officer

15  of Mercury Interactive who knew that those statements were false when made.

16                              **CLASS ACTION ALLEGATIONS**

17         98.   Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23,

18  on behalf of all persons who purchased or acquired the securities of Mercury Interactive between

19  October 22, 2003 and July 5, 2005 (the "Class Period").  Excluded from the Class are defendants,

20  any entity in which a defendant has or had a controlling interest, and members of defendants'

21  families.

22         99.   The members of the Class are so numerous that joinder of all members is

23  impracticable.  The disposition of their claims in a class action will provide substantial benefits to

24  the parties and the Court.  During the Class Period, Mercury Interactive had more than 86 million

25  shares of stock outstanding, owned by thousands of persons.  Record owners and other class

26  members may be identified from records maintained by Mercury Interactive and/or its transfer

27  agents and may be notified of the pendency of the action by mail, using a form customarily used in

28  securities class actions.

100. There is a well-defined community of interest in the questions of law and fact involved in this case. There are no conflicts between plaintiffs and the Class, and plaintiffs' claims are typical of those of other Class members. The questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include the following:

(a) Whether §§10(b) and 20(a) of the Exchange Act were violated by Mercury Interactive and the Individual Defendants.

(b) Whether defendants misrepresented material facts;

(c) Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether the defendants knew or should have known that their statements were false and misleading;

(e) Whether the prices of Mercury Interactive securities were artificially inflated during the Class Period; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

101. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. Furthermore, the damages suffered by individual Class members may be relatively small, and the expense and burden of litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class and securities litigation.

**COUNT 1**
**For Violation of §10(b) of the Exchange Act and**
**Rule 10b-5 Against Mercury Interactive and the Individual Defendants**

102. Plaintiffs incorporate ¶¶1-101 by reference.

1     103.    During the Class Period, defendants disseminated or approved the false statements

2  specified above, which they knew or recklessly disregarded were materially false and misleading in

3  that they contained material misrepresentations and failed to disclose material facts necessary in

4  order to make the statements made, in light of the circumstances under which they were made, not

5  misleading.

6     104.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

7         (a)    Employed devices, schemes, and artifices to defraud;

8         (b)    Made untrue statements of material facts or omitted to state material facts

9  necessary in order to make statements made, in light of the circumstances under which they were

10  made, not misleading; or

11         (c)    Engaged in acts, practices, and a course of business that operated as a fraud or

12  deceit upon plaintiffs and others similarly situated in connection with their purchases or acquisitions

13  of Mercury Interactive securities during the Class Period.

14     105.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of

15  the market, they paid artificially inflated prices for Mercury Interactive securities during the Class

16  Period. Plaintiffs and the Class would not have purchased, acquired or exchanged Mercury

17  Interactive securities at the prices they paid, or at all, if they had been aware that the market prices

18  had been artificially and falsely inflated by defendants' misleading statements.

19     106.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the

20  other members of the Class suffered damages in connection with their purchases and acquisitions of

21  Mercury Interactive securities during the Class Period.

22                        **COUNT II**

               **For Violation of §20(a) of the Exchange Act**

23   **Against Mercury Interactive and the Individual Defendants**

24

25     107.    Plaintiffs incorporate ¶¶1-106 by reference.

26     108.    The Individual Defendants prepared, or were responsible for preparing, the

27  Company's press releases and SEC filings.  By reason of their positions as directors and/or officers

28  of Mercury Interactive they had the power and authority to cause Mercury Interactive to engage in

1 | the wrongful conduct complained of herein.  Mercury Interactive controlled each of the Individual

2 | Defendants and all of its employees.  By reason of such wrongful conduct, the Individual Defendants

3 | and Mercury Interactive are liable pursuant to §20(a) of the Exchange Act.

4

5 | **<u>PRAYER FOR RELIEF</u>**

6 | WHEREFORE, plaintiffs on behalf of themselves and the Class, pray for judgment as follows:

7 | A.      Declaring this action to be a class action properly maintained pursuant to Rule 23 of

8 | the Federal Rules of Civil Procedure;

9 | B.      Awarding plaintiffs and other members of the Class compensatory damages;

10 | C.      Awarding plaintiffs and members of the Class pre-judgment and post-judgment

11 | interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements;

12 | and,

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2       D.      Awarding plaintiffs and other members of the Class such other relief as this Court

3 may deem just and proper under the circumstances.

4                                   **JURY DEMAND**

5       Plaintiffs demand a trial by jury.

6                                          SCOTT + SCOTT, LLC
7 DATED:  August 25, 2005                   ARTHUR L. SHINGLER III

8

9                                           _/s/ Arthur L. Shingler III_
10                                             ARTHUR L. SHINGLER III

11                                          401 B Street, Suite 307
12                                          San Diego, CA  92101
                                            Telephone:  619/233-4565
13                                          619/233-0508 (fax)
                                                 -and-
14                                          SCOTT + SCOTT, LLC
                                            DAVID R. SCOTT
15                                          108 Norwich Avenue
                                            Colchester, CT  06415
16                                          Telephone: 860/537-3818
                                            860/537-4432 (fax)

17                                          Counsel for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

[CORRECTED] COMPLAINT                                          -64-

1        I, Arthur L. Shingler III, am the ECF User whose identification and password are being

2    used to file plaintiff's [Corrected] Complaint for Violation of Securities Laws.  This document is

3    served consistent with General Order 45.IX.B.

4

5    Dated:  August 25, 2005                    SCOTT + SCOTT, LLC

6
                                               By: /s/ Arthur L. Shingler III
7                                                    Arthur L. Shingler III

8                                              Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION OF AMS FUND (named Plaintiff)
## PURSUANT TO FEDERAL SECURITIES LAWS

AMS Fund, Inc., a ("Plaintiff") in the class period, declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff and designee outside counsel, Scott + Scott LLC have reviewed the Complaint. AMS Fund, Inc. hereby retains Scott + Scott, LLC and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis. Scott + Scott, LLC has been designated and acts as outside counsel and counsel for securities monitoring/litigation purposes.

2.    Plaintiff did not purchase the security |Mercury Interactive MERQ that is the subject of this action at the direction of Plaintiff's counsel, or in order to participate in any private action. Plaintiff submits this Certification to protect its rights in this litigation.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. Although at this time plaintiff does not intend to move for the position of leadership.

4.    The AMS transactions are as follows:

| Number of shares | buy/date | price per share |
|---|---|---|
| 500 | 11/13/03 | 49.30 |
| 400 | 11/13/03 | 49.30 |
| 400 | 11/13/03 | 49.30 |
| 300 | 11/13/03 | 49.30 |
| 250 | 11/13/03 | 49.30 |

**TOTAL**          1850 shares

5.    During the three years prior to the date of this Certification, Plaintiff has never served, nor sought to serve, as a class representative in a federal securities fraud case. Plaintiff has not moved for lead plaintiff in the prior three years. AMS Fund Inc currently serves as a lead plaintiff in the Halliburton Securities Litigation pending in the Federal District Court in Dallas Texas, and is a representative plaintiff in the Enron Securities Litigation. AMS Fund Inc moved for these positions more than three years ago.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this day 2 of April, 2005, at Dallas Texas.
August

Paula N. John
Vice President
AMS Fund, Inc.
Milwaukee, WI