**E-Filed 7/30/07**

NOT FOR CITATION

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE MERCURY INTERACTIVE CORP. SECURITIES LITIGATION | Case Number C 05-3395 JF (PVT) ORDER[1] GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND [re:  doc. nos. 130, 133, 134, 137, 139, 147, 152] |

## I. BACKGROUND

**1.     Procedural Background**

        The initial complaint in this action was filed on August 19, 2005.  On December 8, 2005, in light of the filing of several related cases, the Court issued an order setting a briefing schedule for competing motions for appointment as lead plaintiff.  On May 5, 2006, the Court appointed Mercury Pension Fund Group ("Lead Plaintiff") to lead the litigation and approved its choice of lead counsel.  On June 7, 2006, the Court established a schedule for the filing of a consolidated complaint and the briefing of any subsequent motions to dismiss.  On September 8, 2006, the instant consolidated class action complaint ("the Complaint") was filed.  The class is defined as

_____

[1]  This disposition is not designated for publication and may not be cited.

1  "all persons and entities who purchased or otherwise acquired Mercury securities between

2  October 17, 2000, and November 1, 2005, inclusive, and who were damaged thereby."

3  Complaint ¶ 352.

4      The Complaint names nine defendants: Mercury Interactive Corporation ("Mercury" or

5  "the Company"), Amnon Landan, Douglas Smith, Sharlene Abrams, Susan Skaer, Igal Kohavi,

6  Yair Shamir, Giora Yaron, and PricewaterhouseCoopers ("PWC").  The Complaint refers to

7  Landan, Smith, Abrams, and Skaer as the "Officer Defendants," and to Kohavi, Shamir, and

8  Yaron as the "Compensation Committee Defendants."  It refers to the Officer Defendants and the

9  Compensation Committee Defendants as the Individual Defendants, and to the Individual

10  Defendants and Mercury as the Mercury Defendants.  The Complaint asserts three claims: (1)

11  violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated

12  thereunder, against the Mercury Defendants; (2) violation of Section 20(a) of the Securities

13  Exchange Act, against the Officer Defendants and the Compensation Committee Defendants; and

14  (3) violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated

15  thereunder, against PWC.

16      On November 17, 2006, seven separate motions to dismiss[2] were filed by: (1) PWC; (2)

17  Abrams; (3) Skaer; (4) Smith; (5) Mercury; (6) Landan; and (7) the Compensation Committee

18  Defendants.  Lead Plaintiff has filed two oppositions, the first to the motions filed by Mercury

19  and the Individual Defendants, and the second to the motion filed by PWC.  The Court heard oral

20  argument on March 30, 2007.[3]

21  **2.      Factual Allegations**

22      This action arises from the alleged backdating of stock options at Mercury Interactive

23  Corporation ("Mercury").  The Complaint contains the following allegations, which the Court

24  assumes to be true for the purposes of this motion.

25

26      [2]  Defendants also have joined in various portions of each other's motions.

27      [3]  During the briefing of the instant motions, a dispute arose as to the unsealing of the
28  derivative complaint in a factually-related state court action.  That dispute is not the subject of
the instant order.

Case No. C 05-3395 JF (PVT)
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND
(JFLC1)

1   Mercury provides software and services to the business technology optimization

2   marketplace.  Complaint ¶ 13.  It is incorporated under Delaware law and is headquartered in

3   California.  *Id.*  Landan was Chairman of the Board of Mercury ("the Board") from July 1999

4   until he resigned on November 2, 2005.  *Id.* at ¶ 14.  He was Chief Executive Officer from

5   February 1997 until his resignation, and a director from February 1996 until his resignation.  *Id.*

6   Smith was Chief Financial Officer and Executive Vice President from November 2001 until

7   November 2, 2005, when he resigned.  *Id.* at ¶ 15.  Previously, Smith was Executive Vice

8   President of Corporate Development.  *Id.*  Abrams was Chief Financial Officer and Vice

9   President of Finance and Administration from November 1993 until November 2001, when she

10  resigned.  *Id.* at ¶ 16.  Skaer was Vice President, General Counsel, and Secretary of Mercury

11  from November 2000 until November 2, 2005, when she resigned.  *Id.* at ¶ 17.  The

12  Compensation Committee Defendants were the only outside directors on the Board and the only

13  members of the Compensation and Audit Committees from October 1996 to July 2002.  *Id.* at ¶

14  22.  Kohavi and Shamir have been directors since 1994.  *Id.* at ¶¶ 19-20.  Each was a member of

15  the Compensation and Audit Committees from 1996 through June 2006.  *Id.*  Yaron has been a

16  director since 1996 and Chairman of the Board since November 2, 2005.  *Id.* at ¶ 21.  He was

17  chair of the Compensation Committee from 2002 through June 2006.  *Id.*  He was a member of

18  the Audit Committee from 1996 to 2002.  *Id.*  PWC was Mercury's outside public auditor during

19  the class period.  *Id.* at ¶ 24.

20  Mercury has had at least four options plans: the 1989 Stock Option Plan and its

21  replacement, the 1999 Stock Option Plan; the 1994 Directors' Plan; and the 1998 Employee

22  Stock Purchase Plan.  *Id.* at ¶¶ 37-41.  The 1989 Stock Option Plan, under which options no

23  longer are granted, permitted purchase at less than one hundred percent of the fair market value

24  for statutory stock option grants.  *Id.* at ¶ 37.  The 1998 Employee Stock Purchase Plan allows

25  purchase at less than one hundred percent of the fair market value.  *Id.* at ¶ 41.  The 1999 Stock

26  Option Plan and the 1994 Directors' Plan require that the exercise price of options granted

27  thereunder be one hundred percent of fair market value on the date of the grant.  *Id.* at ¶¶ 39, 41.

28  In November 2004, the SEC launched an informal investigation into Mercury's past stock

3

1    option grants. *Id.* at ¶ 45. In July 2005, the Company revealed that there were potential

2    problems with the dating and pricing of stock option grants and with the accounting for these

3    option grants. *Id.* The Board formed a Special Committee to investigate the Company's stock

4    option practices. *Id.* at ¶ 46. In August 2005, the Special Committee concluded that the actual

5    grant dates of certain past stock option grants differed from the dates on which they should have

6    been granted. *Id.* The Special Committee found that on fifty-four separate occasions between

7    1994 and 2005, stock options reflected a grant date that differed from the date on which the

8    option actually had been granted. *Id.* at ¶ 48. In almost every such instance, the price on the

9    actual grant date was higher than the price on the originally stated date. *Id.* Of those fifty-four

10   grants, twenty-four were approved by the Compensation Committee. *Id.* The Special Committee

11   also found that option exercise dates were incorrectly reported, that some option documentation

12   was missing, and that a loan was made by Mercury to Landan without proper documentation. *Id.*

13   at ¶¶ 50, 52, 56. As a result, the Board concluded that Mercury's financial statements from 2000

14   through the first quarter of 2005 no longer should be relied upon because they contained

15   misstatements of material facts and would need to be restated. *Id.* at ¶ 47. On August 29, 2005,

16   Mercury issued a press release stating that it had undertaken a restatement. *Id.* at ¶ 204.[4]

17          On October 4, 2005, Mercury issued a press release that described the pending

18   restatement but that did not disclose the full impact of the backdating on Mercury's financial

19   position. *Id.* at ¶ 204. It also reported that the SEC inquiry had been converted into a formal

20   investigation. *Id.* Mercury's stock price fell from $36.90 to a closing price of $31.61 on October

21   4, 2005. *Id.* at ¶ 351. On November 2, 2005, Mercury issued a press release stating that it had

22   identified forty-nine instances of improper backdating and that it had concluded that internal

23   controls had been inadequate. *Id.* at ¶ 206. Mercury also announced that it had accepted the

24   resignations of Landan, Smith, and Skaer, and stated:

25          Chief Executive Officer Amnon Landan, Chief Financial Officer Douglas Smith,
             and General Counsel Susan Skaer were each aware of and, to varying degrees,
26           participated in the practices discussed above. Each of them also benefited [sic]

27   _____

28          [4] Unlike the other press releases discussed herein, the August 29, 2005 press release is
     not described in detail in the Complaint.

                                                     4

personally from the practices. While each of these officers asserts that he or she did not focus on the fact that the practices and their related accounting were improper, the Special Committee has concluded that each of them knew or should have known that the practices were contrary to the options plan and proper accounting. While the Special Committee is appreciative of and sympathetic to the far-reaching demands of these executives' positions during this critical period, missing or overlooking a practice as basic and important as the proper granting of options is not acceptable.

*Id.* Upon this full disclosure of the improper stock options practices, Mercury stock fell from its November 1, 2005 closing price of $35.00 to $25.66 on November 2, 2005. *Id.* at ¶ 207. Mercury subsequently admitted that each of the financial statements issued from fiscal year 1992 through the end of the first month of fiscal year 2005 was materially false and misleading. *Id.* at ¶ 208. On July 3, 2006, Mercury filed a Form 10-K/A restating its consolidated financial statements for 2002, 2003, and 2004. *Id.* at ¶ 59.

## II.  LEGAL STANDARD

### 1.    Motion to Dismiss

For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969).  Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment.  *Lucas v. Department of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995).  When amendment would be futile, however, dismissal may be ordered with prejudice.  *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).  On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable.  *North Star International v. Arizona Corporation Commission*, 720 F.2d 578, 581 (9th Cir. 1983); *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *Beliveau v. Caras*, 873 F.Supp. 1393, 1395 (C.D. Cal. 1995).  However, under the "incorporation by reference" doctrine, the Court also may consider documents which are referenced extensively in the complaint and which are accepted by all parties as authentic, which are not physically attached to the complaint. *In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970 (9th Cir. 1999).

### 2.    Heightened Pleading Standard Under Rule 9(b) and the PSLRA

Fed. R. Civ. P. 9(b) requires that "the circumstances constituting fraud . . . be stated with particularity."  The Ninth Circuit has explained that a "plaintiff must include statements regarding the time, place, and nature of the alleged fraudulent activities, and that mere conclusory allegations of fraud are insufficient."   *In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1548 (9th Cir. 1994).  A plaintiff asserting fraud "must set forth an explanation as to why the statement or omission complained of was false or misleading." *Id.* (internal quotation marks omitted); *see also Yourish v. California Amplifier*, 191 F.3d 983, 992-93 (9th Cir. 1999).  The Private Securities Litigation Reform Act ("PSLRA") raises the pleading standard even further:

> (1) Misleading statements and omissions
> In any private action arising under this chapter in which the plaintiff alleges that the defendant–
> (A) made an untrue statement of a material fact; or
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> (2) Required state of mind
> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4b(1)-(2).

## III.  DISCUSSION

**1.    Claim One: Violation of Section 10(b) and Rule 10b-5 Against the Mercury Defendants**

    a.    <u>Elements of the Claim</u>

Lead Plaintiff alleges that the Mercury Defendants violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder.  Section 10(b) makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

6

1   15 U.S.C. § 78j(b).  Rule 10b-5 makes it unlawful for any person to use interstate commerce

2       (a) To employ any device, scheme, or artifice to defraud,
        (b) To make any untrue statement of a material fact or to omit to state a material
3       fact necessary in order to make the statements made, in the light of the
        circumstances under which they were made, not misleading, or
4       (c) To engage in any act, practice, or course of business which operates or would
        operate as a fraud or deceit upon any person, in connection with the purchase or
5       sale of any security.

6
7   17 C.F.R. § 240.10b-5.  In cases involving publicly-traded securities and purchases or sales in

    public securities markets, the elements of an action under Section 10(b) and Rule 10b-5 are:  (1)
8
    a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale
9
    of a security, (4) reliance, (5) economic loss, and (6) loss causation.  *Dura Pharmaceuticals, Inc.*
10
    *v. Broudo*, 544 U.S. 336, 341-42 (2005).
11
                b.      The Class Period and the Statute of Limitations
12
                        i.      The Beginning of the Asserted Class Period
13
            Mercury argues that the statute of limitations bars claims by investors who purchased
14
    Mercury stock before September 8, 2001, five years prior to the filing of the Complaint.  This
15
    would exclude a portion of the asserted class because the class period asserted in the Complaint
16
    includes purchasers of Mercury stock between October 17, 2000 and November 1, 2005.
17
    Complaint ¶ 352.  In contrast, the initial complaint in this action asserted a class period that
18
    includes purchasers of Mercury stock between December 1, 2004 and July 5, 2005.  Initial
19
    Complaint ¶ 119.[5]  The relevant statute of limitations provides:
20
        [A] private right of action that involves a claim of fraud, deceit, manipulation, or
21      contravention in contravention of a regulatory requirement concerning the securities
        laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15
22      U.S.C. § 78c(a)(47)), may be brought not later than the earlier of –
            (1) 2 years after the discovery of the facts constituting the
23          violation; or
            (2) 5 years after such violation.
24
    28 U.S.C. § 1658(b).  The five-year period of repose is not subject to tolling.  *See Durning v.*
25
    *Citibank, In'l*, 990 F.2d 1133, 1136-37 (9th Cir. 1993).
26

27
    ─────────────────
28      [5]  Because the initial complaint was filed on August 15, 2005, the class period asserted in
    the Complaint would have begun within five years of that date.

                                                    7

1   The class period asserted in the Complaint includes individuals who purchased Mercury

2   stock more than five years before the filing of the Complaint.  However, Lead Plaintiff argues

3   that the Complaint relates back to the initial complaint in this action and that, accordingly, no

4   portion of the class period is time-barred.  The Ninth Circuit has held that:

5   An amendment adding a party plaintiff relates back to the date of the original
    pleading only when: 1) the original complaint gave the defendant adequate notice
6   of the claims of the newly proposed plaintiff; 2) the relation back does not unfairly
    prejudice the defendant; and 3) there is an identity of interests between the
7   original and newly proposed plaintiff.

8   *In re Syntex Corp. Securities Litigation*, 95 F.3d 922, 935 (9th Cir. 1996).  The court found

9   identity of interests absent in *Syntex* because "[t]he claims of the proposed plaintiffs are different

10  because the newly proposed class members bought stock at different values and after different

11  disclosures and statements were made by Defendants and analysts."  *Id.*  The court also cited its

12  earlier decision in *Besig v. Dolphin Boating & Swimming Club*, 683 F.2d 1271, 1278-79 (9th Cir.

13  1982), in which it had focused on the "central issue of th[e] litigation," the "goals" of the

14  litigants, and the relief sought, in determining whether an identify of interests existed.  *Id.*

15  Applying *Syntex* to the facts now before it, this Court concludes that an identity of

16  interests does not exist between the class members who purchased Mercury stock before

17  September 8, 2001 and those who purchased Mercury stock after that date.  Class members who

18  purchased Mercury stock between October 17, 2000 and September 8, 2001 bought their stock at

19  a much higher price than did purchasers of Mercury stock after September 8, 2001: the

20  Complaint alleges that the share price averaged between $80/share and $100/share in the fourth

21  quarter of 2000 and between $20/share and $40/share during the fourth quarter of 2001.

22  Complaint ¶¶ 222, 259.  Accordingly, while the relief sought may be similar in kind, and may

23  have been triggered by the same disclosures of improper accounting, the quantum of relief sought

24  is vastly different in scale.  Moreover, while they may have been similar in kind and effect,

25  different statements also were made as to the state of Mercury's financials prior to the purchases

26  at issue.  The Court does not hold that a difference in stock price by itself is enough to avoid

27  application of the relation-back doctrine, but *Syntex* does not allow the Court to ignore the

28  significant difference in stock price that is present here.  Because the class should not include

8

1   individuals or entities that purchased Mercury stock prior to September 8, 2001,[6] the Complaint

2   will be dismissed with leave to amend.

3                    ii.    The Statute of Limitations as to Claims Against Abrams

4        Abrams argues that the Complaint alleges no wrongful conduct by her after September 8,

5   2001.  Lead Plaintiff responds that the Complaint alleges in fact wrongful conduct by Abrams in

6   the form of an earnings release dated October 16, 2001.  However, the Complaint does not name

7   Abrams as a person responsible for that release.  If Lead Plaintiff can assert that Abrams

8   committed a wrongful act during the class period, it should do so in an amended complaint.

9             c.    Loss Causation

10       Mercury and Landan argue that the Complaint does not allege loss causation sufficiently.

11  Mercury notes that the Complaint identifies five disclosures occurring on: July 5, 2005; July 28,

12  2005; August 8, 2005; October 4, 2005; and November 2, 2005.  The analysis of each of the

13  disclosures is governed by the decisions of the Supreme Court in *Dura Pharmaceuticals* and of

14  the Ninth Circuit in *In re Daou Systems, Inc. Securities Litigation*, 411 F.3d 1006 (9th Cir.

15  2005).  In *Dura Pharmaceuticals*, the Supreme Court held that the fact that a purchase price was

16  inflated, by itself, does not establish causation of economic loss.  Instead, the Supreme Court

17  reaffirmed the principle that a securities plaintiff must allege both cause and loss.  In *Daou*

18  *Systems*, the Ninth Circuit described the loss causation inquiry as considering whether "the

19

20       [6] Lead Plaintiff cites *In re Network Associates, Inc. II Securities Litigation*, 2003 WL
21  24051280 (N.D.Cal., Mar. 25, 2003) (unpublished).  The court in that case emphasized that the
    claims of the new class members were "based on the same underlying allegations as the original
22  class members" and "[m]ore importantly, all of the claims are based on the same . . . disclosure
    and subsequent stock drop."  *Id.* at *7.  The court read the reference to "disclosures and
23  statements" in *Syntex* as pertaining to the disclosures that caused the stock price drop, not to the
    statements causing stock purchase and supporting the higher stock price.  This reading avoids the
24  conclusion, decried by Lead Plaintiff, that the relation-back doctrine cannot apply in securities
    class actions because the new plaintiffs always will have purchased the stock at a different price.
25  While the Court might have reached a different conclusion in the instant case were the stock
    prices roughly similar, the stock price difference in this action is sufficiently large to bar
26  application of the relation-back doctrine.  The Court notes that at least one other court in this
    district has reached a similar conclusion on similar facts.  *See In re Commtouch Software Ltd.*
27  *Securities Litigation*, 2002 WL 31417998 (N.D.Cal. July 24, 2002) (unpublished) (finding lack
    of identity of interests).
28

                                      9

misrepresentations or omissions caused the harm." *Daou Sytems*, 411 F.3d at 1025.  In that case, the court found a lack of loss causation: "if the improper accounting did not lead to the decrease in Daou's stock price, plaintiffs' reliance on the improper accounting in acquiring the stock would not be sufficiently linked to their damages." *Id.* at 1026.  The court concluded that a loss suffered in an earlier period could not be considered causally related to the alleged fraudulent conduct because that stock drop occurred when "the true nature of Daou's financial condition had not yet been disclosed." *Id.* at 1027.

    The theory of Lead Plaintiff's case appears to be that multiple, individual disclosures caused multiple, individual economic losses.  Such a theory fits within the constraints articulated by *Dura Pharmaceuticals* and *Daou* to the extent that it does not attempt to capture losses attributable to other causes.  By way of example, if a stock fell from $110/share to $10/share over the course of a year, the total loss attributable to the full universe of causes would be $100/share. If, however, after three disclosures of wrongdoing during that overall descent, the stock price fell from $80/share to $70/share, from $60/share to $50/share, and from $40/share to $30/share, and those losses were attributable to the disclosed wrongdoing, a plaintiff would be able to plead loss caused by the wrongdoing in the amount of $30/share, not $100/share.  Any attempt to recover an amount of loss including loss unattributable to the wrongdoing at issue would be barred under *Dura Pharmaceuticals* and *Daou.*  No Defendant has cited authority indicating that a plaintiff only may recover for damages stemming from a single disclosure.  While an earlier disclosure may be relevant to reasonable reliance, an earlier disclosure does not necessarily strip a later disclosure of its ability to cause loss.  Accordingly, while it is not entirely clear that the claims in the Complaint are limited to losses caused by the individual disclosures, Lead Plaintiff may proceed on such a theory in an amended complaint.

                    i.        The July 5, 2005 Disclosure

    Lead Plaintiff alleges that "[o]n July 5, 2005, Mercury disclosed that it had initiated an internal investigation to determine whether it had been improperly accounting for stock option grants, that the SEC had initiated an informal investigation into the matter, and that Mercury would potentially need to restate its past financial statements."  Complaint ¶ 348.  Lead Plaintiff

                                    10

1    does not allege any specific drop in share price as a result of this disclosure.  Accordingly, Lead

2    Plaintiff fails to plead loss causation with respect to the July 5, 2005 disclosure.

3                        ii.      The July 28, 2005 Disclosure

4            Lead Plaintiff alleges that "[o]n July 28, 2005, Mercury disclosed a 'preliminary'

5    conclusion that the resulting restatement of earnings would likely be material and impact prior

6    year's earnings. The price of Mercury stock dropped more than a dollar on this news, closing at

7    $39.15 or $1.11 lower than the previous day's close."  *Id.*  Mercury asserts that this alleged drop

8    is not what it appears to be, in that the disclosure came after the market already had closed for the

9    day and that when the market had the opportunity to digest the information the next day, the

10   stock price actually went up twenty-two cents.  Lead Plaintiff argues that it is not appropriate to

11   consider such assertions at the pleading stage.  While this argument is correct generally,

12   considering that leave to amend is required on other bases, Lead Plaintiff either should omit this

13   disclosure from an amended complaint or plead it with more contextual facts.  It is not in the

14   interest of judicial economy to encourage artful pleading of claims that will be subject to

15   summary adjudication.

16                       iii.      The August 8, 2005 Disclosure

17           Lead Plaintiff alleges that "[o]n August 8, 2005, the Company announced it would miss

18   the deadline for filing its second quarter 2005 Form 10-Q 2005 report with the SEC as a result of

19   the restatement. Mercury's stock price dropped again to close $0.65 lower at $37.62."  *Id.*  The

20   implication of these allegations is that the reported need to restate financials, which was caused

21   by the improper backdating, caused the decline in the price of Mercury's stock.  However, this

22   drop in share price does not appear to be statistically significant, and Lead Plaintiff seemed to

23   concede at oral argument that this disclosure did not form the basis of any economic loss.

24   Accordingly, while Lead Plaintiff may include this disclosure in an amended complaint, the

25   Court notes its skepticism that such an allegation would survive a future motion to dismiss.

26                       iv.      The October 4, 2005 Disclosure

27           Lead Plaintiff alleges that "[o]n October 4, 2005, in its press release reporting preliminary

28   3Q05 results, Mercury revealed that the SEC's informal investigation had been converted to a

11

1    formal investigation. On this news, Mercury's stock price dropped $5.29, or 14.3%, from $36.90

2    to $31.61, although the full extent of the problems at Mercury still had yet to be revealed." *Id.* at

3    ¶ 351.  However, the press release also included the disclosure that Mercury would record third

4    quarter 2005 revenue of $198-205 million, rather than the $205-215 million that previously had

5    been predicted. *Id.* at ¶ 204.  The Complaint does not allege what portion of the loss is

6    attributable to the news regarding the SEC investigation as distinguished from the portion that is

7    attributable to the Company's failure to hit revenue targets.  As the Fifth Circuit observed in

8    *Greenberg v. Crossroads Systems, Inc.*, 364 F.3d 657 (5th Cir. 2004), failure to establish that the

9    disclosure of the relevant wrongdoing played a significant role in a loss merits entry of summary

10   judgment for failure to show loss causation.  This action remains at the pleading stage, however,

11   raising the question as to how specifically a securities plaintiff must plead loss caused by the

12   relevant disclosure, as opposed to loss caused by other simultaneous events.  Because the

13   Complaint will be dismissed with leave to amend on other grounds, the Court need not answer

14   that question at this time.  The Court notes that further specificity as to the loss caused by the

15   October 4, 2005 disclosure would increase the likelihood that an amended version of this aspect

16   of the Complaint will survive a future motion to dismiss.

17                           v.      The November 2, 2005 Disclosure

18          Lead Plaintiff alleges that "[w]hen the full extent of the options backdating scandal was

19   revealed on November 2, 2005, the market reacted swiftly and decisively with the price of

20   Mercury's common stock plummeting 27% from its November 1 closing price of $35.00 to close

21   down $9.44 at $25.66 on November 2."  Complaint at ¶ 351.  Mercury does not appear to contest

22   the pleading of loss causation as to this disclosure.  Landan argues that the loss could have been

23   the result of other causes, but it reasonably may be inferred that these other causes (officer

24   resignations, delisting, delayed financial statements, and a poor outlook) all stem from the

25   underlying wrong.  Accordingly, Landan's challenge to the allegation that the November 2, 2005

26   disclosure of the scope of the backdating problem caused a share price drop of $9.44/share is

27   unpersuasive.

28          However, Mercury also argues that Lead Plaintiff may not graft onto the November 2,

                                                    12

1  2005 disclosure the effects of other disclosures made after the end of the class period.  Mercury

2  argues that the Company's improper accounting for options exercisable with promissory notes

3  was not revealed until July 2006, nine months after the close of the class period.  Lead Plaintiff

4  appears to concede that this is correct, but states that events occurring after the close of the class

5  period remain relevant to scienter.  Opposition to Mercury Motion 30 n.29.  Lead Plaintiff should

6  ensure that any amended complaint is clear as to the relevance of such allegations and that it does

7  not attempt to support loss causation in an inappropriate manner.[7]

8         d.    Reliance

9         Abrams[8] and Landan argue that the Complaint contains insufficient allegations regarding

10 reliance.  Lead Plaintiff argues that it has pled reliance adequately under both the fraud on the

11 market theory allowed under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  The Supreme Court

12 described the fraud on the market theory as follows:

13        The fraud on the market theory is based on the hypothesis that, in an open and
          developed securities market, the price of a company's stock is determined by the
14        available material information regarding the company and its business....
          Misleading statements will therefore defraud purchasers of stock even if the
15        purchasers do not directly rely on the misstatements . . . .  The causal connection
          between the defendants' fraud and the plaintiffs' purchase of stock in such a case
16        is no less significant than in a case of direct reliance on misrepresentations.

17 *Basic Inc.*, 485 U.S. at 241-42 (citing *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986)).

18

19

20        [7] Mercury argues that because the November 2, 2005 disclosure announced that
   *intentional* misconduct ended in April 2, 2002, Plaintiff cannot establish loss causation for any
21 intentional misconduct occurring after April 2, 2002.  This argument is unpersuasive.  While a
   wrong must be disclosed and that disclosure must cause a loss for it to be actionable, Mercury
22 cites no authority indicating that such disclosure must be made in the terms of the relevant claims
   for relief under federal securities law.  Such a rule would create perverse incentives for
23 companies to frame their releases to investors in the most legally insulating manner.  The
   ultimate responsibility for determining whether an action was intentional or negligent does not lie
24 with the Company, but with the Court.  Here, Mercury disclosed that a series of wrongful acts
   had occurred and the market responded to that disclosure.  The use of terms of art does not
25 foreclose potential liability.

26

27        [8] Abrams's argument regarding reliance depends in part on the assertion that the
   Complaint alleges no actions in which she participated.  Because leave to amend will be granted
28 in order that Lead Plaintiff may attempt to make such allegations, the Court does not consider
   Abrams's reliance arguments to the extent that they may be rendered moot by amendment.

13

1    The Supreme Court adopted a rebuttable presumption of reliance based on fraud on the

2    market theory and identified situations in which it might be rebutted:

3          Any showing that severs the link between the alleged misrepresentation and either
           the price received (or paid) by the plaintiff, or his decision to trade at a fair market
4          price, will be sufficient to rebut the presumption of reliance. For example, if
           petitioners could show that the "market makers" were privy to the truth about the
5          merger discussions here with Combustion, and thus that the market price would
           not have been affected by their misrepresentations, the causal connection could be
6          broken: the basis for finding that the fraud had been transmitted through market
           price would be gone. Similarly, if, despite petitioners' allegedly fraudulent
7          attempt to manipulate market price, news of the merger discussions credibly
           entered the market and dissipated the effects of the misstatements, those who
8          traded Basic shares after the corrective statements would have no direct or indirect
           connection with the fraud. Petitioners also could rebut the presumption of reliance
9          as to plaintiffs who would have divested themselves of their Basic shares without
           relying on the integrity of the market. For example, a plaintiff who believed that
10         Basic's statements were false and that Basic was indeed engaged in merger
           discussions, and who consequently believed that Basic stock was artificially
11         underpriced, but sold his shares nevertheless because of other unrelated concerns,
           *e.g.*, potential antitrust problems, or political pressures to divest from shares of
12         certain businesses, could not be said to have relied on the integrity of a price he
           knew had been manipulated.

13

14   *Basic*, 485 U.S. at 248-49.

15         The Court concludes that Lead Plaintiff is entitled at the pleading stage to a presumption

16   of reliance under the fraud on the market theory.  The Court does not read *Dura Pharmaceuticals*

17   as limiting *Basic Inc.*  The presumption of reliance created in *Basic Inc.* is based upon the

18   efficiency of markets, whereas the language highlighted by Landan in *Dura Pharmaceuticals*

19   refers to the severing of loss causation.[9]  While reliance, or transaction causation, and loss

20   causation are related, an extended period of time between purchase and sale does not necessarily

21   affect the underlying efficiency of the market.

22         Because the Court concludes that Lead Plaintiff is entitled to a presumption of reliance

23   under *Basic Inc.*, it need not consider Lead Plaintiff's alternative argument that it can invoke a

24   reliance presumption under *Affiliated Ute Citizens v. United States*, 485 U.S. 224 (1988).  The

25   Court notes that the filing of the initial complaint and its implicit suggestion that the market price

26

27         [9]  *See Dura*, 524 U.S. at 342-43 ("Other things being equal, the longer the time between

28   purchase and sale, the more likely that this is so, *i.e.,* the more likely that other factors caused the
     loss.").

                                                    14

1   no longer could be trusted may be relevant to the reliance analysis if this action passes the

2   pleading stage and defendants seek to rebut the presumption.

3          e.      Economic Loss

4          Landan argues that the Complaint fails to plead economic loss.[10]  Landan argues that the

5   Lead Plaintiff and other named plaintiffs sold their stock too early to be affected by the drop in

6   the stock price allegedly caused by the disclosure of the options backdating.  Lead Plaintiff

7   disputes this assertion.  In light of the dismissal of the Complaint with leave to amend, the Court

8   need not address the dates of the sales at issue.  Lead Plaintiff should ensure that any amended

9   complaint alleges that sales of Mercury stock by the named plaintiffs occurred during the

10  appropriate period.

11         Landan argues that no economic loss can be established on the basis of sales occurring

12  after the commencement of this lawsuit.  In *Dura Pharmaceuticals*, the Supreme Court cited a

13  series of sources discussing the common law requirement that a plaintiff in an action based upon

14  fraudulent misrepresentation suffer economic loss before bringing suit.  *See Dura*

15  *Pharmaceuticals*, 544 U.S. at 344 (citing *e.g.* M. Bigelow, Law of Torts 101 (8th ed. 1907)

16  (damage "must already have been suffered before the beginning of the suit").  However, the

17  Supreme Court did not address the question, presented by the facts alleged in the Complaint, as

18  to whether the filing of an initial complaint based upon an initial and incomplete disclosure of

19  wrongdoing precludes the filing of an amended complaint after a fuller disclosure has been made.

20  Landan cites no authority prohibiting such an amendment.  Instead, while *Dura Pharmaceuticals*

21  prohibits the filing of a complaint without *any* allegation of loss and loss causation, the Court

22  concludes that it does not bar the filing of an amended complaint alleging a greater loss for which

23  loss causation also can be pled.[11]

24  _____

25  [10]  This argument is made jointly with the argument, discussed above, that the Complaint
26  fails to plead loss causation.  It is discussed here to the extent that it is separate from the loss
    causation argument.

27  [11]  Landan's argument is stronger in the contexts of loss causation and reliance.  It
28  suggests that the class cannot have relied upon the stock price after the filing of the initial
    complaint.  It also implies that, since an earlier complaint was filed on the basis of a cause that

1       f.      Scienter

2    The Ninth Circuit has explained:

3    [A] private securities plaintiff proceeding under the PSLRA must plead, in great
     detail, facts that constitute strong circumstantial evidence of deliberately reckless
4    or conscious misconduct. . . . [A]lthough facts showing mere recklessness or a
     motive to commit fraud and opportunity to do so may provide some reasonable
5    inference of intent, they are not sufficient to establish a strong inference of
     deliberate recklessness. In order to show a strong inference of deliberate
6    recklessness, plaintiffs must state facts that come closer to demonstrating intent,
     as opposed to mere motive and opportunity. Accordingly, . . . particular facts
7    giving rise to a strong inference of deliberate recklessness, at a minimum, is
     required to satisfy the heightened pleading standard under the PSLRA.

8

9    *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 974 (9th Cir. 1999).  Each

10   defendant argues that the Complaint alleges its scienter inadequately.

11              i.      The Compensation Committee Defendants

12      The Compensation Committee Defendants, each of whom served as an outside director

13   during the relevant period, argue that the Complaint fails to allege sufficient facts regarding

14   scienter as to those financial statements signed by them.[12]  This argument is well taken.  The

15   Complaint contains insufficient allegations of fact giving rise to the inference that the

16   Compensation Committee Defendants acted knowingly or with deliberate recklessness in

17   approving backdated options.  Instead, the Complaint alleges that those defendants signed

18   incorrect financial statements and that the "Special Committee found that questions should have

19   been raised in the minds of the Compensation Committee members from 1998 to 2002 –

20   including Kohavi, Shamir and Yaron – as to whether grants they approved were properly dated."

21

22   occurred prior to such filing, any injury after that time must have been the result of other causes.
     In other words, if the initial complaint captured the loss caused by the misrepresentations at issue
23   in this action, the losses that occurred after the filing of the initial complaint must not have
     caused by those misrepresentations.  However, while these are interesting arguments that are
24   potentially compelling in other contexts, the Court concludes that they are premature at the
25   pleading stage.

26      [12]  The Compensation Committee Defendants also argue that the Complaint fails to allege
     that they signed the large bulk of the financial statements at issue in this action.  Lead Plaintiff
27   appears to concede that liability does not attach to those defendants for the bulk of the
     misstatements, as it focuses upon five Form 10-K's filed during the asserted class period that
28   were signed by the Compensation Committee Defendants.

Case No. C 05-3395 JF (PVT)
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND
(JFLC1)

1   Complaint ¶ 247.  While their alleged conduct throughout this period, and particularly their

2   alleged failure to recognize or pursue warning signs, may have been negligent, the allegations of

3   the Complaint are insufficient to create a strong inference of knowledge or deliberate

4   recklessness as required by *Silicon Graphics*.

5               ii.      The Officer Defendants

6           The Complaint alleges that the Company lacked effective internal controls during the

7   period of the backdating, and that the Special Committee concluded that Landan, Smith, and

8   Skaer knew or should have known that the Company's accounting practices violated GAAP and

9   that those defendants knew or should have known about the backdating practices.  One court in

10  this district has concluded that similar allegations are sufficient to establish scienter.  *See In re*

11  *McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248 (N.D.Cal. 2000).  In light of its decision

12  to dismiss the Complaint with leave to amend on other grounds, and considering that the

13  question of scienter appears close, particularly as to Landan and Skaer, the Court concludes that

14  it should not attempt to resolve this question without the benefit of the anticipated amendment.

15  Accordingly, in addition to the amendments discussed elsewhere in this order, an amended

16  complaint should include all specific allegations relevant to the scienter of Landan, Smith,

17  Abrams, and Skaer.

18              iii.     Mercury

19          As Mercury argues, to the extent that the Complaint fails to plead scienter with respect to

20  any of the individual defendants, it also fails to plead scienter with respect to Mercury.  *See In re*

21  *Apple Computer, Inc., Securities Litigation*, 243 F.Supp.2d 1012, 1023 (N.D.Cal. 2002) ("A

22  defendant corporation is deemed to have the requisite scienter for fraud only if the individual

23  corporate officer making the statement has the requisite level of scienter, i.e., knows that the

24  statement is false, or is at least deliberately reckless as to its falsity, at the time that he or she

25  makes the statement.").  Accordingly, a claim against Mercury in an amended complaint will be

26  subject to dismissal if Lead Plaintiff fails to allege scienter by one of the individual defendants.

27          g.      Scheme Liability

28          Rule 10b-5(b) pertains to "untrue statement[s] of a material fact" or the omission of such

17

a fact.  The bulk of the Complaint focuses on such untrue statements, with approximately one

hundred and fifty paragraphs dedicated to that purpose.  *See* Complaint ¶¶ 59-205.  However,

Lead Plaintiff also alleges that the Mercury Defendants "carried out a plan, scheme and course of

conduct" that caused violations of Rule 10b-5(a) & (c).  *See Id.* at ¶¶ 362-63.  Lead Plaintiff

alleges that the scheme was carried out by:

> (1) intentionally selecting a more favorable price for option grants that had
> previously been granted at a higher price; (2) failing to adhere to the legal terms of
> promissory notes used by employees to exercise stock options, evidenced by
> interest and principal forgiveness, subsequent modifications to the length and
> collateral of the notes, and additional principal added to the note without
> additional collateral; (3) failing to properly account for stock-based compensation
> to certain individuals who held consulting, transition or advisory roles with the
> Company either preceding or following their full-time employment with the
> Company; and (4) reporting false exercise dates for options whereon the price of
> Mercury stock was substantially lower on the reported exercise date than on the
> date the option was actually exercised.

*Id.* at ¶ 34.

The Ninth Circuit has explained that:

> Participation in a fraudulent transaction by itself, however, is insufficient to
> qualify the defendant as a "primary violator" if the deceptive nature of the
> transaction or scheme was not an intended result, at least in part, of the
> defendant's own conduct. We hold that to be liable as a primary violator of §
> 10(b) for participation in a "scheme to defraud," the defendant must have engaged
> in conduct that had the principal purpose and effect of creating a false appearance
> of fact in furtherance of the scheme. It is not enough that a *transaction* in which a
> defendant was involved had a deceptive purpose and effect; the defendant's *own
> conduct* contributing to the transaction or overall scheme must have had a
> deceptive purpose and effect.

*Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006).  Because the Complaint

contains insufficient allegations that the various defendants' contributions to the overall scheme

had a deceptive purpose and effect, the scheme allegations will be dismissed.  Lead Plaintiff

stated at oral argument that the scheme allegations were part of a "belts and suspenders"

approach in the Complaint.  While Lead Plaintiff is not precluded by this order from including

scheme allegations in an amended complaint, the Court notes its skepticism that Lead Plaintiff

will be able to state a separate claim for scheme liability and directs Lead Plaintiff not to include

redundant allegations in any amended complaint.

   h.  <u>Challenges to the Class Definition</u>

18

1   Landan challenges the class definition asserted in the Complaint, arguing that there must

2   be individualized determinations as to who should be included in the class.  Landan Motion 10-

3   11.  The Court concludes that this challenge is premature.  In light of its conclusion that the

4   Complaint should be dismissed with leave to amend, the Court notes that an amended complaint

5   may address any deficiencies in the class definition.

6   **2.      Claim Two: Violation of Rule 20(a) Against the Mercury Defendants**

7   Section 20(a) provides:

8   > Every person who, directly or indirectly, controls any person liable under any
9   > provision of this chapter or of any rule or regulation thereunder shall also be liable
    > jointly and severally with and to the same extent as such controlled person to any
    > person to whom such controlled person is liable, unless the controlling person
10  > acted in good faith and did not directly or indirectly induce the act or acts
    > constituting the violation or cause of action.

11

12  15 U.S.C. § 78t(a).  "To establish 'controlling person' liability, the plaintiff must show that a

13  primary violation was committed and that the defendant 'directly or indirectly' controlled the

14  violator."  *Paracor Finance, Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir.

15  1996).  As discussed above, Lead Plaintiff has failed to state a claim for a primary violation of

16  the securities laws.  However, it is possible that it will do so in an amended pleading.

17  Accordingly, the Section 20(A) claim will be dismissed with leave to amend.

18  **3.      Claim Three: Violation of Section 10(b) and Rule 10b-5 Against PWC**

19  PWC moves to dismiss the claim against it on the basis that the Complaint does not plead

20  scienter adequately.  This Court has explained in a previous action that when asserting a claim

21  under Section 10(b) against a public auditor, " a plaintiff must demonstrate that 'the accounting

22  practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to

23  see the obvious, or to investigate the doubtful, or that the accounting judgments which were

24  made were such that no reasonable accountant would have made the same decisions if confronted

25  with the same facts.'"  *In re Redback Networks, Inc.*, 2006 WL 1805579, *6 (N.D.Cal. Mar. 20,

26  2006) (citing *In re Software Toolworks, Inc.*, 50 F.3d 615, 627 (9th Cir. 1994)).  Accordingly,

27  this motion turns on the question as to whether PWC was deceived by the individuals who

28  backdated options or whether PWC knew about the backdating or allowed it to occur by acting

19

1    recklessly.  As discussed below, the Court concludes that while it may be able to do so in an

2    amended complaint, Lead Plaintiff has not pled facts supporting a strong inference of knowledge

3    or recklessness.  Accordingly, this claim will be dismissed with leave to amend.[13]

4           Lead Plaintiff argues that PWC's alleged failure to heed six "red flags" is powerful

5    evidence of scienter.  However, the failure to heed these purported "red flags," even taken

6    together, does not amount to deliberate recklessness or the failure to provide any audit at all.

7    First, while Mercury discovered upon investigation that what appeared to be recourse notes in

8    fact were not treated as such, Lead Plaintiff alleges no facts indicating that PWC knew or should

9    have known of Mercury's alleged misconduct at the time it occurred.  Second, the fact that

10   options were granted on a broad range of dates within the year may have represented a deviation

11   from past practice, but it does not suggest by itself that PWC was deliberately reckless in its

12   audit.  Third, Lead Plaintiff alleges no facts indicating that PWC knew of long delays between

13   'grant dates' and the approval of the grants, and, at least as currently alleged, PWC's failure to

14   check a sufficient number of option grants amounts to negligence rather than deliberate

15   recklessness.  Fourth, it is unreasonable to describe PWC as reckless for failing to connect a

16   decline in option grants after the passage of the Sarbanes-Oxley Act with the backdating of

17   options, particularly in light of the possibility of other explanations for such a decline.  Fifth,

18   even if PWC had discovered an improper loan to Landan, it is not clear that such a discovery

19   would have led it to discover the improper backdating of stock options.  Finally, the fact that

20   PWC inherited a client that previously had taken a charge due to a mistake in backdating did not

21   by itself put PWC on notice that illegal backdating might be occurring at Mercury.

22          If proved, PWC's alleged failure to exercise due care and exhibit a proper degree of

23   professional skepticism, to evaluate Mercury's internal controls properly, and to gather sufficient

24   evidence to support its unqualified endorsements of Mercury's financial statements all reflect

25   poorly on the quality of work performed by PWC.  However, while such actions may amount to

26

27        [13]  PWC argues that the asserted fact that the investigation into the backdating at Mercury
     cost over seventy million dollars means that it could not have been expected to discover the
28   backdating.  This argument ignores the obvious possibility that PWC's wrongdoing contributed
     to the expense of discovering the fraudulent activities.

Case No. C 05-3395 JF (PVT)
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND
(JFLC1)

negligence, they do not rise to the level of deliberate recklessness.  Nor does the scope of the restatement rendered necessary by the backdating alter the insufficient character of the other allegations.  Instead, the allegations against PWC amount to a series of allegations about improprieties at Mercury and a conjecture that PWC must have known about it.  As currently pled, this is the type of "fraud by hindsight" theory barred by the PSLRA.  *See Silicon Graphics*, 183 F.3d at 488.

## IV.  ORDER

Good cause therefor appearing, IT IS HEREBY ORDERED that the motions to dismiss are GRANTED with leave to amend.  Any amended complaint shall be filed within thirty days of the issuance of this order.

DATED: 7/30/07

_____
JEREMY FOGEL
United States District Judge

Case No. C 05-3395 JF (PVT)
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND
(JFLC1)

Copies of Order served on:

| | |
|---|---|
| Joel H. Bernstein | jbernstein@labaton.com |
| Asim M. Bhansali | amb@kvn.com, efiling@kvn.com, gap@kvn.com, pwm@kvn.com |
| Peter Arthur Binkow | info@glancylaw.com, pbinkow@glancylaw.com |
| Jayson E. Blake | jeb@millerlawpc.com, aad@millerlawpc.com |
| Sara B. Brody | sara.brody@hellerehrman.com, Cecilia.Chan@hellerehrman.com, Gary.Padilla@hellerehrman.com, Sebastian.Jerez@hellerehrman.com, terri.newman@hellerehrman.com |
| Lucy Edmond Buford | lbuford@orrick.com, jknight@orrick.com |
| Howard S. Caro | hcaro@hewm.com, benjamin.diggs@hellerehrman.com, gary.padilla@hellerehrman.com, SFDocCal@hewm.com |
| Michael Cecchini | mcecchini@gibsondunn.com, jhess@gibsondunn.com |
| Cecilia Y. Chan | cecilia.chan@hellerehrman.com |
| John D. Cline | jcline@jonesday.com, adlangenbach@jonesday.com, cyip@jonesday.com, tmdanowski@jonesday.com |
| Erica L. Craven | elc@lrolaw.com, amw@lrolaw.com |
| Aaron H. Darsky | adarsky@schubert-reed.com |
| Alan I. Ellman | aellman@labaton.com, cchan@labaton.com |
| Jeffrey S. Facter | jfacter@shearman.com, jae.ko@shearman.com, rcheatham@shearman.com |
| Scott A. Fink | sfink@gibsondunn.com, bhonniball@gibsondunn.com |
| Michael M. Goldberg | info@glancylaw.com |
| Louis J Gottlieb | lgottlieb@glrslaw.com |
| Azadeh Gowharrizi | azadeh.gowharrizi@shearman.com |
| Alicia G. Huffman | alicia.huffman@shearman.com, rcheatham@shearman.com, ron.cheatham@shearman.com |
| Benedict Y Hur | bhur@kvn.com, efiling@kvn.com, gpeterson@kvn.com |
| Russel N. Jacobson | Rjacobson@labaton.com |
| Willem F. Jonckheer | wjonckheer@schubert-reed.com |
| Nicole Acton Jones | nicole.jones@hellerehrman.com, harriette.louie@hellerehrman.com |

Case No. C 05-3395 JF (PVT)
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND
(JFLC1)

1    Christopher J. Keller           ckeller@labaton.com, cchan@labaton.com

2    Jan Nielsen Little             jnl@kvn.com, efiling@kvn.com, srg@kvn.com

3    K.C. Maxwell , Esq           kcmaxwell@jonesday.com

4    E. Powell Miller              epm@millerlawpc.com, asl@millerlawpc.com

5    Patrick David Robbins       probbins@shearman.com, rcheatham@shearman.com

6    Michael H. Rogers           mrogers@labaton.com

7    Adam Richard Sand , Esq    invalidaddress@invalidaddress.com

8    Michael Adam Schwartz , Esq    mschwartz@wolfpopper.com

9    David R. Scott               drscott@scott-scott.com

10   Michael Todd Scott         tscott@orrick.com, elee@orrick.com

11   Arthur L. Shingler , III       ashingler@scott-scott.com, ssawyer@scott-scott.com

12   C. Brandon Wisoff          bwisoff@fbm.com, calendar@fbm.com, mzappas@fbm.com

13   Notice has been delivered by other means to:

14   Conor R. Crowley
     Goodkind Labaton Rudoff & Sucharow LLP
15   100 Park Avenue
     New York, NY 10017
16

17   Donald Delaney
     100 Park Avenue
18   New York, NY 10017

19   Glenn E. Mintzer
     One Charled Center
     100 N. Charles Street
20   Baltimore, MD 21201

21   Public Employees' Retirement System of Mississippi
     c/o Schubert & Reed LLP,
22   Three Embarcadero Center, Suite 1650
     San Francisco, CA 94111
23

24   Andrew T. Solomon
     Sullivan & Worcester, LLP
     1290 Avenue of the Ameicas
25   New York, NY 10104

26   Robin Wechkin
     Heller Ehrman LLP
27   701 Fifth Avenue
     Suite 6100
28   Seattle, WA 98104

Case No. C 05-3395 JF (PVT)
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND
(JFLC1)